IN THE UNITED STATES DISTRICT COURT
IN THE EASTERN DISTRICT OF KENTUCKY
COVINGTON DIVISION


|  |  |
|---|---|
| MICHELLE RACE, | ) |
| Plaintiff, | ) |
|  | ) CASE NO.: |
|  | ) 2:18-CV-00094-WOB-CJS |
| vs. | ) |
|  | ) |
| DELTA AIR LINES, INC. | ) |
| Defendant. | ) |

------------------------------/


Federal Rule 30(b)(6) deposition of JOSH JESSUP, taken on behalf of PLAINTIFF, pursuant to the stipulations set forth below, before Meg Armistead, Certified Court Reporter, at 1030 Delta Boulevard, Atlanta, Georgia, commencing at the hour of approximately 10:15 a.m, Friday, November 8, 2019.


BULL & ASSOCIATES, INC.
COURT AND DEPOSITION REPORTERS
315 West Ponce de Leon Avenue, Suite 650
Decatur, Georgia 30030
(404) 256-2886

1   **APPEARANCES OF COUNSEL:**

2   **FOR THE PLAINTIFF:**
            W. KASH STILZ, JR., Esq.
3           Roush & Stilz, P.S.C.
            19 West Eleventh Street
4           Covington, Kentucky 41001
            Phone: (859) 291-8400
5           Fax: (859) 291-6555
            E-mail: kash@roushandstilzlaw.com
6
    **FOR DEFENDANT:**
7           ANDREA LYNN BOWMAN, Attorney at Law
            Delta Air Lines Inc.
8           Law Dept Suite 981
            PO Box 20574
9           Atlanta, Georgia 30320-2574
            Phone:  (404) 715-3586
10          Email:  Andrea.bowman@delta.com

11          RICHARD L. MOORE, Esq.
            Frost Brown Todd, LLC
12          301 East Fourth Street, Suite 3300
            Cincinnati, Ohio 45202
13          Email: rlmoore@fbtlaw.com

14

15

16

17

18

19

20

21

22

23

24

25

2

# INDEX TO PROCEEDINGS

## EXAMINATION INDEX

**WITNESS**                                                    **PAGE**
**JOSH JESSUP**

**EXAMINATION by MR. W. KASH STILZ, JR.**          4

**EXAMINATION by MR. RICHARD L. MOORE**          43

---

## INDEX TO EXHIBITS

Plaintiff's Exhibit No. 1                          10

Plaintiff's Exhibit No. 2                          11

Plaintiff's Exhibit No. 3                          23

Plaintiff's Exhibit No. 4                          26

Plaintiff's Exhibit No. 5                          28

Plaintiff's Exhibit No. 6                          29

Plaintiff's Exhibit No. 7                          36

Plaintiff's Exhibit No. 6, re-marked               42

(In the following transcript, dashes [--] are used to indicate an intentional or purposeful interruption of a sentence, and ellipsis [...] is used to indicate halting speech or an unfinished sentence in dialogue, written material.)

3

1          (The Reporter's Disclosure was presented and

2    is attached.)

3                        JOSH JESSUP

4    having been previously sworn, testifies as follows:

5                        EXAMINATION

6    BY MR. W. KASH STILZ, JR.:

7        Q    Could you please state your name for the

8    record?

9        A    Josh Jessup.

10       Q    Mr. Jessup, my name is Kash Stilz.  I

11   represent Michelle Race in this litigation.  I've

12   noticed this deposition under Federal Rule 30(b)(6).

13   Are you familiar with what that is?

14       A    In general terms, yes.

15       Q    I've asked Delta to designate somebody to

16   testify about a number of issues that I've listed in the

17   deposition notice.  Are you willing to testify on

18   Delta's behalf today?

19       A    Yes.

20       Q    Are you prepared to testify about the issues I

21   want to cover?

22       A    Yes.

23       Q    You've been designated for all of them?

24       A    That's my understanding; yes.

25       Q    I'm going apologize.  I kind of jump all over

4

the place; so if there's something that I say or ask

that may confuse you or if I ask you a question that you

don't understand, please tell me you don't understand.

I'll try to rephrase.  It looks like this is being

stenographically taken; so if all your answers could be

audible, that would be helpful instead of nods --

     A    Certainly.

     Q    -- or "uh-huhs."

          Let's just jump right into it.  The first

issue that I wanted -- that I have questions about

concerns Delta's antiharassment and antidiscrimination

policy and procedure for -- in Ms. Race's situation.

          Do you know where she was employed?

          THE WITNESS:  I'm sorry.  Do I know when or

where?

     Q    (By  Mr. Stilz)  Where?

     A    Yes.  Cincinnati.

     Q    Do you know what she did?

     A    She was a below wing agent in our customer

service.

     Q    And as far as Delta's antiharassment and

antidiscrimination policy, I believe that's been made in

the record in Ms. Race's deposition.  Can you in your

own words describe to me what the Delta's antiharassment

and antidiscrimination policy is?

1      **A**    We do not tolerate any type of harassment or

2  discrimination of our employees, and we'll deal with

3  those matters when they're brought to our attention and

4  deal with them.

5      **Q**    As far as procedure, how would an employee go

6  about reporting what they consider to be harassment or

7  discrimination?

8      **A**    There are a number of different ways they can

9  report that.  They could talk to their leader.  They

10  could talk to HR.  They could call an anonymous hotline,

11  or they could talk to any other leader that isn't their

12  leader.  It's an open-door policy.

13      **Q**    Once that report is brought in, what is

14  Delta's typical response?

15      **A**    The typical response would be to investigate

16  it.  Depending on the specifics of the case, it may be

17  investigated by a local leader -- local leaders

18  involved.  It may be investigated by HR.  You know,

19  could be a combination of the two.

20      **Q**    I know in some of the discovery documents that

21  I've been provided, it looks like those investigations,

22  at least depending upon who's doing it, are put down in

23  writing at least; is that accurate?

24      **A**    Yes.

25      **Q**    All right.  Is there any electronic audio

1    recording/video recording done in the investigations

2    that you're aware of?

3         A    Not as normal course of business, no.

4         Q    All right.  If Delta determines that there has

5    been a violation of the harassment or discrimination

6    policy perpetrated by an employee, does Delta have a

7    typical response, or is the response more of a

8    subjective, "We look at this on a case-by-case basis"?

9         A    It would be -- very much be looked at on a

10   case-by-case basis.

11        Q    Is there any objective criteria that you're

12   aware of that Delta employs when they are going to take

13   action under their antiharassment or discrimination

14   policy?

15             THE WITNESS:  Could you be more specific?

16        Q    (By Mr. Stilz)  Is there any kind of -- for

17   instance, in a progressive discipline, if an employee

18   has done -- let's say they've done something that Delta

19   considers to be low tiered.  Is there then a response to

20   that; that is -- what's the word I'm looking for?

21             MR. STILZ:  Strike that question.  Let me -- I

22   think I can ask it better this way.

23        Q    (By  Mr. Stilz)  Are there degrees of

24   violations of the policy?

25        A    Yes.

                                                         7

1    Q    Okay.  So if there's a violation of the

2  policy, there's no guarantee if an employee violates a

3  policy, they're going to get terminated?

4    A    That is correct.

5    Q    Okay.  All right.  Under Section B -- I know

6  this is a little broad -- Delta's employee handbook that

7  applied to the plaintiff -- this might be a good time --

8  I think I want to join that one with the flight benefits

9  travel pass that is available to employees such as

10  Ms. Race.

11    A    Okay.

12    Q    Are you comfortable with that, that being

13  contained in the employee handbook?

14    A    We don't have an employee handbook that would

15  include all that.  We have a number of different

16  policies, but I'm comfortable speaking to any of those.

17    Q    These various documents that were provided by

18  Delta and Bates-stamped at the bottom, if you could take

19  a look at those.

20        MR. STILZ:  I apologize.  I don't have copies

21  of these because I'm traveling.

22        THE WITNESS:  I'm sorry.  You waiting for me?

23    Q    (By  Mr. Stilz)  Just for the record, could

24  you read the Bates numbers that I've got that I provided

25  you?  They're at the bottom.

8

1    A    Is that Delta --

2         MR. STILZ:  Yeah.

3    A    Delta 000030.

4    Q    (By  Mr. Stilz)  You can read the last two

5  numbers -- or the last three numbers --

6    A    That'll be easier.

7    Q    -- of each page.

8    A    I also have Delta 51, Delta 52, Delta 65.

9    Q    Have you had a chance to review them?

10   A    Yes.

11   Q    That travel-pass policy.  That would have

12 applied to Ms. Race in or around November of 2014 and

13 continuing until the end of 2016?

14        MR. MOORE:  Let me raise an objection.  I

15 think there were only certain pages of travel-pass

16 policy that were provided as part of this exhibit.

17   Q    (By Mr. Stilz)  That's part of the travel-pass

18 policy?

19   A    This is our travel-pass policy; yes.

20   Q    Can you, Mr. Jessup, in your own words

21 describe what an employee of Ms. Race's position -- what

22 she -- her travel-pass benefits would have been?

23   A    In general terms, employees have the ability

24 to travel standby on Delta flights if a seat's available

25 for themselves and certain family members.  And they

9

1    also have the opportunity to have friend and family

2    passes, a limited number of friend and family passes.

3             MR. STILZ:  Okay.  And we're going to mark

4    those as Exhibit 1.

5             (Plaintiff's Exhibit No. 1 was marked for

6    identification.)

7        Q    (By  Mr. Stilz)  As far as domestic relations

8    or domestic partnership, Delta has a domestic

9    partnership policy; correct?

10       A    Correct.  If an employee does not have a

11   spouse, then they can designate a domestic partner.

12       Q    And what are the qualifications for someone to

13   be a domestic partner of an employee of Delta?

14       A    In general terms -- I couldn't speak to the

15   exact requirements, but in general terms, they need to

16   be living in a spouselike relationship and be able to

17   demonstrate with documents that illustrate that type of

18   relationship.

19       Q    Okay.  I think on page 51 -- I'm sorry.  On

20   Bates Stamp 65, which might be the last document --

21       A    Okay.

22       Q    -- does that contain the domestic partnership

23   eligibility requirement?

24       A    Yes.

25       Q    Okay.  And it looks like there are five

10

1    requirements; is that correct?

2        A    Yes.

3        Q    All right.  To your knowledge, are there any

4    more requirements?

5        A    Not that I'm aware of.

6        Q    Let's go through one by one.  Can you read the

7    first one for me?

8        A    Both are at least 18 years of age.

9        Q    Obviously, we didn't have any problems with

10   that case with Ms. Race and Mr. Freeman.

11       A    As far as I know.

12       Q    And maybe I should back up.  The domestic

13   partnership travel pass that Ms. Race signed up for was

14   for Brandon Freeman; is that correct?

15            Can you read --

16            MR. STILZ:  Strike that question.

17       Q    (By Mr. Stilz)  Around November of 2014, do

18   you remember whether or not Ms. Race signed up for a

19   domestic partnership travel pass for her domestic

20   partner, Brandon Freeman?

21       A    I wouldn't able to speak to specific dates.

22            MR. STILZ:  We'll mark this as Exhibit 2.

23            (Plaintiff's Exhibit No. 2 was marked for

24   identification.)

25       Q    (By  Mr. Stilz)  Take a look that and maybe

                                                          11

1  show Mr. Moore.  Can you identify the Bates numbers for

2  us?

3        A    Yes.  It's Delta 102, Delta 103, and Delta

4  104.

5        Q    All right.  Do you know what that document is?

6        A    This is an affidavit of opposite-sex domestic

7  partnership.  This would be the paperwork that would be

8  required to identify someone as a domestic partner for

9  domestic benefits.

10       Q    Does that document reflect the employee is

11  Michelle Race?

12       A    Yes.

13       Q    And that she's trying to sign up her and

14  Brandon for domestic partnership travel-pass benefits?

15       A    Yes.

16       Q    All right, sir.  Going back to the last page

17  of Exhibit 1 here, keep going to list if we could.  What

18  was No. 2?

19       A    "Neither is legally married or common-law

20  spouse to any other person, and neither is engaged in

21  another domestic partnership."

22       Q    Does Delta do anything to check whether or not

23  employees qualify under that particular eligibility

24  requirement, other than the affidavit that the employee

25  signs?

12

1    A    Not to my knowledge.

2    Q    Okay.  Do you know whether or not Ms. Race and

3 Mr. Freeman were eligible under that particular

4 requirement when she signed up?

5    A    Let me clarify my last answer.  So I would say

6 proactively, if there is something brought to our

7 attention, we would follow up on it.  To my knowledge, I

8 don't know of anything that we do to regularly check on

9 the status of the last one.

10   Q    Okay.  All right.  What's the third?

11   A    The next one, "Are not related by blood."

12   Q    Okay.  What's 4?

13   A    "Reside together in the same personal

14 residence and have lived in a spouse-type relationship

15 for at least six consecutive months."

16   Q    And is the six consecutive months -- is that

17 at the time they sign up?

18   A    That is at the time that they sign up to

19 qualify to begin that relationship --

20   Q    Okay.

21   A    -- or document the beginning of that

22 relationship.

23   Q    Do you know what Delta means by "personal

24 residence"?

25        THE WITNESS:  I could give you my best guess.

                                                    13

1          MR. STILZ:  That's fine.

2     A     To my knowledge, I'm not aware of a Delta

3 official definition, but to me it would be residing in

4 the same household.

5     Q     (By  Mr. Stilz)  Okay.  And do you know

6 whether or not Delta employees that sign up for this

7 particular benefit -- is that explained to them, what

8 "personal residence" is meant to be?

9     A     I would have to read through the

10 documentation, but I think that the expectation would be

11 that they understand that they're living in the same

12 residence and have lived in a spouse-type relationship

13 for at least six consecutive months.

14     Q     Does Delta define what "spouse-type

15 relationship" is?

16     A     I would have to check the documentation.

17     Q     That's what we're here for.  Take your time.

18 If it's not in this documentation, fine.  If it's in

19 something else, I need to know if it is and where those

20 documents are.

21          MR. MOORE:  Sorry, Kash.  I don't want to do a

22 speaking, but is the question:  If it was defined, it

23 would be in one of those two documents?  So if it's not

24 in those documents, it's not --

25     Q     (By  Mr. Stilz)  I guess my question is two

14

1   parts:  Is it in a document where it's defined; and if

2   it's not, does somebody at Delta explain to the employee

3   what is meant by "spouselike relationship"?

4       A    Like I say, I would have to read through these

5   documents to give you an answer of whether it's in here,

6   you know.  In general terms to my knowledge, I don't

7   know that we've had people that thoroughly question what

8   does a "spouselike relationship" mean.  I think the name

9   spouselike relationship is fairly explanatory.  But if

10  somebody does have a question about it, we would

11  certainly, you know, understand why they had that

12  question and what would lead them to have that question

13  and provide as much verification as we could.

14      Q    Okay.  And I think we're at the -- are we at

15  the last requirement there?

16      A    Yeah, the last one, "Are financially

17  interdependent."

18      Q    What does Delta mean by "financially

19  interdependent"?

20      A    Again, I can't give you an official

21  definition, but I think my interpretation -- the way I

22  would hope an employee would understand this is that

23  just as the last one indicates, they're demonstrating

24  that they live in a relationship in a similar spouselike

25  relationship where they share finances and -- well,

                                                          15

where they share finances.

Q    Okay.  And in order to sign up for the domestic partnership travel pass, does the employee have to complete this affidavit that we've identified as Exhibit 2 from Ms. Race's situation?  Is that the application that's typically filed by an employee and signed?

A    Yes.

Q    Is there any other evidence Delta requires when they sign up for this to prove they're in a domestic partnership?

A    I do believe they require some documentation to support that.

Q    All right.  And I will submit to you that unless I could have missed it, I didn't see anything in the documents that were provided to me that indicate that -- what Ms. Race would have provided with her affidavit.  Do you have any -- I know this was five years ago.

Do you have any recollection of what documents she would have submitted or did submit?

A    Let me -- again, this is -- I ... I have a very good general understanding of this, but this is not a day-to-day program that I administer.

In the case where we require employees to

16

1    provide documentation, in some cases we allow them to

2    fill it out.  And if we have a question or concern, they

3    may need to submit it.  In other cases they have to

4    submit it.  I don't know for sure if we were asking them

5    for documentation.  I would expect we would be looking

6    for documentation to show that they had lived in a

7    spouse-type relationship.  I believe we request things

8    like utility bills in common names and things like that

9    and financial documents to show they're financially

10   interdependent, like, bank accounts.  I don't know the

11   exact circumstances where we did that, but I know we've

12   asked for documentation for these benefits.

13       Q    Well, let me ask you in general terms:  If an

14   employee wanted to signed up for it, fills out the

15   affidavit, and is not able to provide you with

16   documentation requested, would their request be denied?

17       A    Yes.

18       Q    Okay.  Do you know whether or not in November

19   2014, when Ms. Race appears to have signed up for these

20   travel passes, whether or not she -- her application was

21   denied?

22       A    I don't have that detail.

23       Q    Do you know if it was approved?

24       A    I ... I don't have any knowledge of that

25   process.  It was my understanding that at some point,

17

she had Brandon Freeman as a domestic partner on her

benefits.  My understanding is that it happened at some

point, but I don't know the timing or process that took

place.

Q    Is it reason to think if she had him on her

official travel pass, somebody would have had to

approved it?

A    Yes, or -- yeah; she would have had to

complete the process to begin that benefit.

Q    All right.  And as far as the domestic partner

travel passes is concerned, is there any audit that

Delta does after an employee signed up for that?

A    To my knowledge, there's not a regular audit.

We would normally review that if we had -- you know,

somebody brought to our attention, "Hey.  So-and-so's

travel companion isn't really somebody that they know,"

or, "They're selling their passes," things like that.

Something is brought to our attention, we'll investigate

that.  And then occasionally we have done audits on an

ad-hoc basis.

Q    What criteria goes into the ad-hoc decision?

A    In -- it would depend on circumstances.  It's

not something we do on a regular occasion that I'm aware

of.

Q    Okay.  When you guys get wind that somebody --

18

1    an employee might be violating the domestic partner

2    travel-pass program, what procedures are in place to

3    investigate that?  How does that work?

4         A    Whatever information is provided, we would

5    investigate, get an understanding of what the reality

6    is, and take appropriate action based on that.

7         Q    Are you familiar at all with the investigation

8    that was done in Ms. Race's case in 2016?

9         A    I guess in general terms.  I need a more

10   specific question to be able to speak intelligently to

11   that.

12        Q    Are you you're aware that she received a final

13   notice that stripped her of her domestic partnership

14   flight benefits?

15        A    Yes.

16        Q    Do you know the reason for that?

17        A    My understanding is that based on statements

18   made by her and possibly Mr. Freeman, there was

19   information shared that they were not living in the same

20   residence and financially interdependent as they

21   represented.

22        Q    Okay.  And are you familiar with -- there were

23   bank statements that my client produced from a bank

24   account that she and Mr. Freeman had together.  Are you

25   familiar with the documents that were produced during

                                                              19

1    her deposition?

2         A    I'm familiar that there were documents.   I

3    don't believe I've seen them.

4         Q    Okay.   Does Delta ... does Delta require

5    employees -- an employee living in a domestic

6    partnership with another person to show financial

7    interdependence?   Do they require to employees to keep a

8    specific amount of money in a joint bank account?

9         A    Not that I'm aware of.   The intent is to show

10   the financial interdependence.

11        Q    And so without that objective baseline, is it

12   fair to say, then, that Delta has to make a subjective

13   determination based upon that -- based upon what

14   information is provided in the bank account whether or

15   not they believe an employee and a domestic partner are

16   living in a domestic partnership in accordance with the

17   travel policy?

18             THE WITNESS:   Would you clarify your question?

19             MR. STILZ:   Let me see if I can't separate it.

20        Q    (By  Mr. Stilz)  Is it fair to say that when

21   an employee presents a -- for instance, a joint bank

22   account to Delta to show financial interdependence,

23   there's no objective standard that Delta applies to

24   determine that whatever's in that bank account shows

25   financial interdependence?

                                                          20

1        A    I would say there's not an objective balance

2   requirement.  Again, the intent is to show they're

3   financially interdependent, not a requirement, that as

4   long as you have a certain amount of money in your bank

5   account, that means some objective criteria.

6        Q    So it's fair to say that whoever the Delta

7   representative is that's looking at that to determine

8   financial interdependence is doing so subjectively?

9        A    There is a subjective decision made to whether

10  there's financial interdependence.

11       Q    Okay.  And is the same true as far as how

12  Delta determines whether or not an employee and a

13  domestic partner are residing in the same personal

14  residence?

15       A    I'm not sure how to answer that question.

16  They're either living in the same residence, or they're

17  not.

18       Q    Okay.  Is there a specific period of time that

19  they have to live in the same residence?

20       A    The period of time on their domestic partner

21  for the employee.

22       Q    Is it fair to say, Mr. Jessup, that an

23  employee ...

24            MR. STILZ:  Strike that question.

25            All right.  Let me come back to that.  Let me

                                                        21

1    figure out how I want to ask it.

2            THE WITNESS:  Sure.

3        Q    (By Mr. Stilz)  Let's see if we can't knock

4    some of these smaller ones off the list.  Outside -- are

5    you familiar with Ms. Race's disciplinary history while

6    she's been at Delta?

7        A    I believe so.  I've seen her team journal, and

8    I know she had a corrective action notice.  I'm not

9    aware if there's anything after that.

10       Q    As far as Delta's disciplinary process, does

11   Delta have a progressive disciplinary system?

12           THE WITNESS:  Define what you mean by

13   "progressive discipline."

14           MR. STILZ:  Typically you get a verbal,

15   written suspension, termination.  Something along those

16   lines.  Obviously an employer can go from A to D

17   depending upon the severity of whatever the infraction

18   is.

19       A    Our process does have multiple steps but does

20   not require every step be followed in every

21   circumstances; yeah.

22       Q    (By Mr. Stilz)  Okay.  And in Ms. Race's case

23   when she was given that final corrective action notice,

24   do you know who made the determination to give it to

25   her?

                                                          22

1    **A**    I do not.

2         MR. STILZ:  Okay.  I'm going to give you this

3    document.  Hopefully this will either refresh your

4    recollection, or it will answer a question.

5         THE WITNESS:  Okay.

6         MR. STILZ:  We'll mark that as 3.

7         (Plaintiff's Exhibit No. 3 was marked for

8    identification.)

9    **Q**    (By Mr. Stilz)  After you finish looking at

10   that, if you could read in the Bates number again for

11   the record.

12   **A**    Okay.  All right.  Bates numbers are Delta

13   302, Delta 303, and Delta 304.

14   **Q**    Are you familiar with the documents I just

15   provided you?

16   **A**    Yes.

17   **Q**    All right.  Could you explain what they are?

18   **A**    This will be a final corrective action notice

19   for Ms. Race.

20   **Q**    Okay.  And who was the person that gave it to

21   her?

22   **A**    So looks like this came from Matthew

23   Arlinghaus, A-r-l-i-n-g-h-a-u-s.

24   **Q**    Do you know who Mr. Arlinghaus is?

25   **A**    I believe he would have been a -- an OSM,

                                                    23

1    operations service manager, in Cincinnati, likely her

2    direct front-line leader.

3        Q    Her direct supervisor?  Okay.

4            And reading the final corrective notice, what

5    is -- what was his position, at least as far as in the

6    email, as far as why he gave Ms. Race this final

7    corrective action notice?

8            THE WITNESS:  The reason this letter was

9    given?

10           MR. STILZ:  Yes.

11       A    So the gist of this is, she represented

12   Brandon Freeman as her domestic partner, and it came to

13   our attention that she did not meet those requirements

14   of domestic partnership.

15       Q    (By  Mr. Stilz)  As far as how Delta came to

16   know about the content of that email, am I correct in

17   saying that that was from her deposition that was given

18   in Mr. Freeman's case against Delta?

19           MR. MOORE:  Objection.

20           You can answer.

21       A    That is what the documentation shows.

22       Q    (By  Mr. Stilz)  Okay.  And that would have

23   been, I think, in October of 2016.  I don't think it's

24   reflected in the email, but do you have any personal --

25       A    I could not speak to the specific dates.

                                                      24

1   **Q**   Okay.  Have you had a chance to read her

2   deposition testimony yourself?

3   **A**   No.

4   **Q**   All right.  So you can't tell me what -- as

5   far as --

6        MR. STILZ:  I'm going to steal this from you

7   for two seconds.

8   **Q**   (By Mr. Stilz)  It indicates, "During recent

9   depositions in a legal matter involving Mr. Freeman, Mr.

10  Freeman identified his residence as a residence

11  different from yours.  He also testified his

12  relationship with you is on again/off again, and the two

13  of you have been taking a break during the last three

14  months.  As part of same proceeding --" and this the

15  important part -- "You claimed under oath that you and

16  Mr. Freeman had lived on and off again for a couple of

17  years."

18        Do you know what time period that Ms. Race may

19  or may not have been alluding to in her deposition about

20  living on and off again for a couple of years with Mr.

21  Freeman?

22  **A**   I couldn't speak to what her intentions were.

23  **Q**   Okay.  As far as the final corrective action

24  notices are concerned, Mr. Jessup, are you aware whether

25  or not Ms. Race appealed or tried to appeal that

                                                    25

1    decision?

2        A    I believe she did appeal that decision.

3        Q    I'm not going to play hide the ball here.  I'm

4    going give --

5            Do you know who she appealed to, first?

6        A    I believe she appealed to Brian Sansucci in

7    our equal opportunity department.  I don't know if there

8    were others previous that that.

9        Q    I want to ask you about this.

10           MR. STILZ:  And we'll mark this as 4.

11           (Plaintiff's Exhibit No. 4 was marked for

12   identification.)

13           MR. STILZ:  This is going to be 4, Richard.

14       Q    (By Mr. Stilz)  All right.  Can you read those

15   Bates numbers into the record for us?

16       A    Delta 321, Delta 322.

17       Q    Okay.  Now, I think in looking at these, we're

18   at a little bit of a loss because when you look on the

19   first page here, it doesn't look like it indicates who

20   this is from.  And that's really what I want you to

21   concentrate on, this email that starts at the bottom of

22   that first page and goes to the second.

23           Can you tell whose response this is to

24   Ms. Race's email?  And if you don't know, that is fine.

25   I'm just trying -- because, obviously, I don't know.

                                                              26

1    And it doesn't have a date on there; so that doesn't

2    help us either.

3         A     Yeah.  I cannot say for sure.

4         Q     The only thing -- looking at the top --

5         A     June 29 from Brian to Michelle, but I can't

6    tell if that's part of the email or not.

7              MR. MOORE:  I think this may clarify.  If you

8    look at 322 --

9              We can do this off the record, if you like.

10             MR. STILZ:  We can do it on.

11             MR. MOORE:  If you look at 322, Michelle's

12   email to Brian, looks like she's looking for the

13   original writeup.

14             MR. STILZ:  Is that what that is?

15             MR. MOORE:  Looks like the email you were

16   asking about was duplicative in the final corrective

17   action.  Looks like Brian is responding to her request.

18             MR. STILZ:  Yeah.  That's what it says:  "I

19   received word from HR that the can is electronic and

20   that your acknowledgment signature also was

21   electronically pasted below as well as in the system."

22             So it appears he copied and pasted that.

23   Maybe I misread that.

24        Q     (By  Mr. Stilz)  That's from Brian; correct?

25        A     This email -- he copied and pasted basically

27

1    the texts of the corrective action notice in the body of

2    the email.

3        Q    And that was June 29; is that correct?

4        A    June 29 of '17.

5            MR. STILZ:  Of '17.  All right.  So that's 4.

6    What I'll show you next is 5.

7            (Plaintiff's Exhibit No. 5 was marked for

8    identification.)

9        Q    (By Mr. Stilz)  This -- I'll submit to you the

10   dates looks like it was a little bit later.  Take a look

11   at those two documents, Mr. Jessup.  My questions will

12   be brief.

13       A    (Witness complies.)

14           MR. MOORE:  Is it just 321?  Is it just one

15   page?

16           MR. STILZ:  No; it should be two.

17           MR. MOORE:  319 and 20?

18           THE WITNESS:  Yeah.

19           MR. MOORE:  Thank you.  Sorry.

20           THE WITNESS:  You going to ask me questions

21   about the content about this?

22       Q    (By Mr. Stilz)  Does that look to you to be

23   Ms. Race's appeal to Brian and Brian's answer to her

24   appeal?

25       A    That is what these appear to be; yes.

                                                        28

1        MR. STILZ:  Okay.  All right.  Thank you.  And

2   then I'm going back in time a little bit and date.  This

3   is 4.  This will be 6.

4        (Plaintiff's Exhibit No. 6 was marked for

5   identification.)

6        Q    (By Mr. Stilz)  And 6.  If you can read the

7   Bates numbers for us, Mr. Jessup.  It's two pages.

8        A    Delta 354 and Delta 355.

9        Q    All right.  Can you tell us what this document

10  appears to be?

11        MR. MOORE:  Kash, just for the record, I'm

12  going to object.  It looks like these documents are from

13  a longer string.  Page 354 -- beginning is page 3, and

14  355 -- I understand that you want to focus on those

15  areas, but I wanted to state for the record, that looks

16  like those are bigger records.

17        Q    (By  Mr. Stilz)  And let me know when you've

18  had a chance to read that.

19        A    All right.  I've had a chance to read this.

20        Q    Who is -- do you know who MM is?

21        A    Matt Morris was a manager who was responsible

22  for Cincinnati.

23        Q    Is that who Ms. Race would have attempted to

24  appeal to first, perhaps?

25        A    She certainly could.

1    Q    And looks like the email he sent her was back

2    in January of 2017; is that correct?

3    A    Yes.

4    Q    Do you agree with me, the corrective action

5    notice was written to Ms. Race in December of '16?  That

6    would be Exhibit 3.

7    A    December of '16, yes.

8         MR. STILZ:  All right.  Okay.  So we'll mark

9    that as 6.  And, obviously, the email speaks for itself.

10    Q    (By Mr. Stilz)  All right.  Is it accurate to

11    say that after Ms. Race's appeals to Delta, Delta

12    decided to uphold its initial corrective action

13    decision?

14    A    Yes.

15    Q    To your knowledge, Mr. Jessup, at any time

16    prior to the expiration of the final corrective action,

17    did Delta rescind any of the discipline it gave to

18    Ms. Race?

19    A    Not to my knowledge.

20    Q    How does Delta determine the monetary value of

21    its travel-pass program?

22    A    We don't.

23    Q    And I read something in the travel pass.  As

24    long as it complies with certain Internal Revenue code

25    sections, in a situation such as Ms. Race's where she's

30

1    claiming she has a domestic partner, how would Delta

2    report that to the IRS?  Or would they?

3        A    I believe there's some yield-fair requirement

4    that we show as some sort of imputed income to meet the

5    IRS requirements.

6        Q    Do you know -- for instance, in the year prior

7    to her suspension of benefits, do you know what Delta

8    imputed to Ms. Race as far as her travel benefits?

9        A    I don't have that information.

10       Q    If I showed you a list of the flights that it

11   appears that she has used, would it even be possible for

12   you to do that?

13       A    No.

14       Q    So is it fair to say, then, from the dates

15   that my client was suspended from using her travel

16   benefits, is it even possible to figure out the monetary

17   value of those benefits that were taken from her?

18       A    I don't think you can equate a monetary value

19   to the flight benefits.  They're standby benefit.  You

20   may or may not get on any flight.  Any flight -- it's

21   not a monetary-value thing.  The IRS piece of that is so

22   disconnected from any true value that it -- there's no

23   way to put a value on this flight privilege.

24       Q    Okay.  All right.  Backing up a little bit as

25   far as the flight-benefits program is concerned, other

                                                        31

1  than receiving a written copy of the policy, I'm

2  assuming employees receive a written copy so that you

3  have a copy of the policy; is that accurate?

4       A    They do receive written copies of some of the

5  documentation.  All of it is available to them

6  electronically at any time.

7       Q    Is there any training that employees get

8  outside of getting access to the policy?

9       A    There are a number of different things that

10  they would have certainly -- someone during her

11  employment would have had.  There was a lot of

12  communication that took place during the time of our

13  merger with Northwest.  Normally during orientation it's

14  covered.  So there's a number of different opportunities

15  for information about that.

16       Q    Let me get a little bit more specific on you.

17  As far as the domestic partnership travel pass, are you

18  aware of any training that employees receive when they

19  sign up for that?

20       A    I'm not aware of training.  It would be more

21  the policy and documentation that they fill out that

22  would educate them on that.  Any questions they have,

23  they have many resources to have those answered.

24       Q    So is it fair to say, if the employees -- if

25  they have a question, it's their responsibility to ask?

32

1    **A**    Yes.  And that's I think pretty clear on in

2    all of our documents.  These flight benefits are a

3    privilege, and it's their responsibility to understand

4    these policies when they take advantage of them.  When

5    things change, it's their responsibility to communicate

6    that to Delta.

7    **Q**    Are you aware of any policy changes to the

8    domestic partnership flight-benefit plan that's been

9    made by Delta, say, between December of '16 and January

10   of '18?

11   **A**    I couldn't speak to any specific changes

12   during that period of time.

13   **Q**    Just in December of 2016 -- and, let's say,

14   through the first of January '18 -- do you know what

15   Ms. Race's chain of command would have been at CBG?  And

16   I think Rich and I talked about if you want to provide a

17   list, that's fine.

18          MR. MOORE:  Why don't we do that?

19   **A**    It would probably be better to provide you a

20   list afterwards.

21          MR. MOORE:  This is just CBG?

22          MR. STILZ:  Yeah, just the chain she'd have

23   reported to.

24   **Q**    (By  Mr. Stilz)  Now, as Ms. Race testified,

25   she testified in deposition, prior to her corrective

33

1    action notice -- and obviously the transcript will speak

2    for itself.  This is my recollection of it, that she

3    tried to apply for a job at the Sky Club through

4    something called an e-bid process.

5            Is there an e-bid process at Delta?

6        A    There's an e-bid process at Delta.

7        Q    What is the e-bid process?

8        A    E-bid is our electronic job-posting board.

9    Any positions that are opened up to all employees would

10    be posted there.

11        Q    All right.  If an employee wants to apply for

12    something through the e-bid, how does that work?

13        A    They would go to this electronic job board,

14    click on the position they're interested in, and fill

15    out the information.

16        Q    I think Ms. Race did that.  Does Delta have

17    any documentation that she, in fact, did that between or

18    in the year 2016?

19        A    My understanding is that we do not have any

20    record of that.  And based on just the history of

21    Cincinnati, I don't believe we would have posted a

22    position on e-bid for Cincinnati.  We were going through

23    a pretty significant reduction during that period of

24    time in Cincinnati, and we weren't looking to bring any

25    people into Cincinnati.

                                                            34

1    Q    And specifically for a position in the Sky

2    Club?

3    A    Right.  Right.  We would not have posted that

4    on e-bid.

5    Q    All right.  But as far as a document

6    retention, if the document existed, you all would still

7    have it; is that accurate?

8    A    If something was posted on e-bid, we would

9    have a record of that and who applied for it.

10    Q    Is it possible then, Mr. Jessup, for you to

11    know what the wages and benefits would have been for a

12    position in Sky Club that Ms. Race indicates that she

13    tried to apply for?

14    A    There would be a record of what the pay rates

15    would have been.  There would have been no pay

16    difference if it were a ready-reserve position, which

17    was her position.  The pay rates and benefits would have

18    been the same.

19    Q    Would you have any personal knowledge of the

20    response that was provided by Delta to the Equal

21    Employment Opportunity Commission when Ms. Race filed

22    this charge of retaliation regarding her removal from

23    the travel-pass program?

24        THE WITNESS:  I don't understand what you mean

25    by "any knowledge of it."

35

1    Q    (By Mr. Stilz)  Did you have a hand in
2  crafting it?

3    A    I don't -- no; I would not have drafted that.

4    Q    Would you be able to recognize it if I showed
5  it to you?

6    A    Possibly.

7         MR. STILZ:  Mark this is as 7.

8         (Plaintiff's Exhibit No. 7 was marked for
9  identification.)

10    Q    (By Mr. Stilz)  Take a look at it, and when
11  you're done, just read the Bates numbers for us.  I just
12  have one question about that.

13    A    (Witness complies.)

14         MR. MOORE:  I'm sorry.

15         MR. STILZ:  Sorry, Richard.

16         MR. MOORE:  Thank you.  I just wanted to look
17  at this.

18    A    We've got documents Delta 287 Delta 288, 289,
19  and Delta 290 and Delta 291.

20    Q    (By Mr. Stilz)  From what I handed you, Mr.
21  Jessup, can you tell me what that document looks like?

22    A    So this -- so this appears to be Delta's
23  response to the EEOC regarding claims Ms. Race made.

24    Q    Who signed the letter?

25    A    Ryan Langel.

36

1    Q    Do you know who Mr. Langel is?

2    A    He is a member of our legal department.

3    Q    Currently still?

4    A    Yes.

5    Q    Okay.  Good deal.  Okay.  Thank you.

6         I may have asked you this.  I apologize if I'm

7    repeating myself.  I believe you said you haven't read

8    Ms. Race's deposition testimony given in the Freeman

9    case; is that accurate?

10   A    That is correct.

11   Q    So you wouldn't be able to tell me whether or

12   not Delta believes the testimony she gave in that case

13   was beneficial to the Freeman plaintiffs?

14   A    I don't believe I'd be able to speak to that.

15        One clarification.  You asked me earlier if I

16   was able to speak to the time period she was referring

17   to when she was talking about her on-again/off-again

18   relationship.  I do want to point out that each of her

19   appeal opportunities would have been an opportunity for

20   her to provide any clarification around that period of

21   time, documentation to show what that living

22   relationship looked like, documents showing

23   interdependence of finances.  So that is the point of

24   each of those appeal processes.

25   Q    Okay.

1       **A**    It's taken very seriously.

2       **Q**    The documentation that we've -- that I've

3 given you today and we've marked as exhibits, those are

4 Delta's responses to her appeals?

5       **A**    Those are responses to her appeal.

6       **Q**    -- from Mr. Morrison and -- I can't remember

7 his name.

8       **A**    Senserjee.

9       **Q**    Thank you.

10        Have you had a chance to read the complaint

11 that Ms. Race filed in this case?

12       **A**    I don't recall.

13       **Q**    Okay.

14       **A**    I've been through a lot of documents in the

15 last 24 hours.

16       **Q**    As far as this most recent charge she filed

17 regarding what she believed to be retaliation from using

18 her travel pass, has any employee at Delta been

19 disciplined because of what Ms. Race alleges is

20 retaliation?

21       **A**    To my knowledge, we were not able to

22 substantiate any of her allegations of discrimination

23 based upon the conversations we had with the individuals

24 involved and her reluctance to participate in those

25 investigations.

1      Q    I guess maybe I asked that question poorly.

2  But what I'm trying to find out is if there was any

3  employee that either was involved in the investigation

4  around her misuse of the travel benefits that would have

5  been disciplined because of something they did in that

6  investigation.

7           THE WITNESS:  I'm sorry.  I'm not clear.

8      Q    (By Mr. Stilz)  Was Mr. Morrison disciplined

9  because he turned her appeal down?

10     A    No.

11     Q    Was Mr. --

12          THE WITNESS:  Mr. Sansucci?

13          MR. STILZ:  Yes.

14     A    To my knowledge, he was not.

15     Q    (By  Mr. Stilz)  Does Delta consider Ms. Race

16 to be a troublesome employee?

17          MR. MOORE:  Objection.  I guess a little

18 beyond the scope.

19          But you can answer if you can.

20     A    I wouldn't feel comfortable making any

21 characterization on other people's opinions on that

22 matter.  I'm not close enough to it.

23     Q    (By  Mr. Stilz)  You've been identified as

24 Delta's rep.  That's why I'm asking whether or not

25 Delta -- I guess it kind of goes to her disciplinary,

39

1  whether or not -- the history, whether or not Delta

2  would consider her to be a troublesome employee.

3          MR. MOORE:  Same objection.

4          You can answer.

5      A    I wouldn't label someone a troublesome

6  employee.

7      Q    (By Mr. Stilz)  Ms. Race has made some

8  allegations following her deposition testimony in

9  October 2016 and her final corrective notice that she

10  thinks there was some other things going on that she

11  believes are harassment and intimidation.  I would like

12  to go through these with you and see if you have any

13  knowledge about them.

14          She indicates she was not informed of required

15  in-house classes for performing her job.

16          Do you know what she's talking about?

17      A    From the documentation that I've reviewed, it

18  appears she was claiming she was not made aware of

19  training to do the de-icing process, which would have

20  been a function based on her shift.

21      Q    Did Delta do an investigation on that

22  accusation?

23      A    I don't know the details of what took place at

24  the time.  In my own understanding of what took place,

25  the circumstances that were described there don't align

                                                          40

1  with the way our processes work.  It's not a one-time

2  training.  We've never prevented somebody from being

3  able to work because of the training.  So the facts --

4  the allegations don't line up with the facts of the

5  reality of the operation there.

6      Q    Do you know whether or not Delta provided any

7  discipline to Ms. Race for perhaps not missing -- or for

8  missing these classes?

9      A    My understanding is, she did not miss the

10  class.  She attended.

11     Q    All right.  She also alleges that management

12  tried to impose new work-hour requirements which were

13  not expected of other workers.  Were you aware of that

14  allegation?

15     A    I saw that.  I'm not aware of what that would

16  be.  Her work requirements were a seniority-based

17  shifted process.

18     Q    So Delta didn't do any investigation of that

19  allegation?

20     A    I couldn't speak to what did or didn't happen.

21  I wasn't a part of that.

22         MR. STILZ:  I might be done.  Just give me a

23  couple of minutes.

24         MR. MOORE:  Great.

25         (A recess was taken.)

41

1    MR. STILZ:  Richard, I'm going to take you up

2  on your objection -- I think it's Exhibit 6 -- and add

3  the whole email chain so we have some perspective.

4    MR. MOORE:  Okay.

5    (Plaintiff's Exhibit No. 6 was re-marked for

6  identification.)

7    Q    (By  Mr. Stilz)  What I'll do is, Mr. Jessup,

8  I'll give you an opportunity to look at everything.

9    A    Okay.

10    Q    The only question I'm going to have for you is

11  whether or not it looks like the complete discussion

12  that occurred between Ms. Race and Mr. Morrison --

13    MR. MOORE:  Are we on the record?

14    THE COURT REPORTER:  Yes.

15    Q    (By  Mr. Stilz)  -- in that email chain.  Look

16  at what I re-marked as Exhibit 6 and read me the Bates

17  numbers when you're finished.

18    A    Okay.  So I have documents Delta 352, Delta

19  353, Delta 354, Delta 355, and Delta 356.

20    Q    Okay.  Does that -- in your words, can you

21  tell me what those documents appear to be?

22    A    This appears to be an email conversation

23  between Ms. Race and Mr. Morrison regarding her request

24  to appeal it.

25    Q    I think I have two more questions.  Do you

1    know whether or not -- in Ms. Race's deposition, was

2    there anybody at Delta that requested that their lawyer

3    subpoena her bank records?

4            MR. MOORE:  Objection.  Don't discuss anything

5    that would involve any conversations with attorneys,

6    either in house or outside, with Delta.

7            MR. STILZ:  Which means I think he can't

8    answer the question.

9            I need to certify that.

10   Q    (By Mr. Stilz)  And do you know whether Delta

11   requested their attorneys give any information

12   specifically regarding Ms. Race's domestic partnership

13   travel eligibility at her deposition from Delta's

14   attorneys?

15           MR. MOORE:  Same objection and instruct him

16   not to answer.

17           MR. STILZ:  Same certification.

18           Mr. Jessup, thank you.

19           MR. MOORE:  I just have a few follow up.

20                        EXAMINATION

21   BY:  MR. RICHARD L. MOORE

22   Q    Let me ask you to take a look at that last

23   exhibit that you took a look at.  In that first

24   paragraph in the edge of that email chain, in the email

25   from Mr. Morrison to Ms. Race, does Mr. Morrison direct

43

1   Ms. Race to any individual in terms of handling her

2   written appeal?

3        A    Yeah.  He does identify Branson Sansucci.

4        Q    And that was the same Mr. Sansucci that

5   provided the response that's been marked as Exhibit 5?

6        A    Yes.

7        Q    All right, sir.  Just a couple of more

8   clarifying questions.  And I apologize.  I'll have to

9   use the exhibits.  So I'll reach over to make this a

10  little bit faster, I hope.

11           Let me start with Exhibit 3, and I'm going to

12  direct your attention to Bates No. 303.  You were asked

13  questions about this section where it says, "During

14  recent depositions in the legal matter ..."

15           Do you see that?

16       A    Yes.

17       Q    Does that reference -- whose deposition

18  testimony is referenced in that section of the document?

19  Can you tell?

20       A    It's referencing both Mr. Freeman and

21  Ms. Race's deposition comments.

22       Q    Okay.  And, sir, I'm going to ask you to take

23  a look at Exhibit 2, which is the affidavit of domestic

24  partnership and specifically with respect to paragraph 2

25  of that document.  Do you see where I am?

44

1      **A**    Yes.

2      **Q**    Does that section of the affidavit require

3  that the applicant provide any specific documentation?

4      **A**    Yes; it does identify specific documentation

5  and requires them to provide the following.  Yes.

6      **Q**    What kind of documentation is required?

7      **A**    It says, "Documents showing shared primary

8  residence; joint mortgage, lease, or deed record; joint

9  banking account or credit card, designation of

10  opposite-sex domestic partner as a durable power of

11  attorney, or other similar documentation of financial

12  interdependence."

13          MR. MOORE:  Just one moment.  Okay.  That's

14  all I have.  Thank you, sir.

15          MR. STILZ:  Good.

16          THE COURT REPORTER:  Who needs that

17  transcribed?

18          MR. STILZ:  Yes.  Sorry.

19          THE COURT REPORTER:  Ms. Bowman, did you need

20  a copy?

21          MS. ANDREA L. BOWMAN:  No, thank you.

22          MR. MOORE:  We'll want signature.

23          (Deposition concluded at 11:32 a.m.)

24

25

1                    **CERTIFICATION OF QUESTION**

**GEORGIA:**
2  **FULTON COUNTY:**

3          In the foregoing transcript, counsel for
**PLAINTIFF** requested certification of the following
4  question(s):

5          At page 42, line 25:

6

7      Q    I think I have two more questions.  Do you

8  know whether or not -- in Ms. Race's deposition, was

9  there anybody at Delta that requested that their lawyer

10 subpoena her bank records?

11

12         At page 43, line 10:

13

14     Q    (By  Mr. Stilz)  And do you know whether Delta

15 requested their attorneys give any information

16 specifically regarding Ms. Race's domestic partnership

17 travel eligibility at her deposition from Delta's

18 attorneys?

19

20         This _____ day of _____ 2019.

21

22         _____

23         MEG ARMISTEAD, Certified Court
           Reporter (B-2011). My commission
24         expires March 31, 2020

25

46

# J U R A T

_____

**JOSH JESSUP**

_____

**Notary Public**

**Sworn and Subscribed to me**

**This _____ day of _____.**

47

# C E R T I F I C A T E

**GEORGIA:**

**FAYETTE COUNTY:**

    I hereby certify that the foregoing deposition was stenographically recorded by me as stated in the caption, and the colloquies, questions and answers were reduce to typewriting under my direction; that the foregoing transcript is a true and correct record of the evidence given.

    The above certification is expressly withdrawn and denied upon the disassembly or photocopying of the foregoing transcript, unless said disassembly or photocopying is done under the auspices of BULL AND ASSOCIATES, INC., Certified Court Reporters, and the signature and original seal is attached thereto.

    I further certify that I am not a relative, employee, attorney or counsel of the parties, nor am I a relative or employee of such attorney or of any party, nor am I financially interested in the outcome of the action.

    This 12th day of December, 2019.

MEG ARMISTEAD, Certified Court
Reporter (B-2011) My commission
expires March 31, 2020

48

**DISCLOSURE**

Pursuant to Article 10.B of the Rules and Regulations of the Judicial Council of Georgia, I make the following disclosure:

I am a Georgia Certified Court Reporter. I am here as a representative of BULL AND ASSOCIATES, INC.

Bull and Associates, Inc. was contacted to provide court reporting services for this deposition. Bull and Associates, Inc. will not be taking this deposition under any contract that is prohibited by O.C.G.A 9-11-28 (c)., O.C.G.A. 15-14-37(a) and (b).

Bull & Associates, Inc. has no contract/agreement to provide reporting services with any party to the case, any counsel in the case, or any reporter or reporting agency from whom a referral might have been made to cover this deposition.

Bull & Associates, Inc. will charge its usual and customary rates to all parties in the case, and a financial discount will not be given to any party to this litigation.

**OFFICIAL CODE OF GEORGIA ANNOTATED 15-14-37**
(a)    Contracts for court reporting services, not related to a particular case or reporting incident, between a certified court reporter or any person with whom a certified court reporter has a principal and agency relationship and any attorney at law, party to an action, or party having a financial interest in an action, are prohibited. Attorneys shall not be prohibited from negotiating or bidding reasonable fees for services on a case-by-case basis.

(b)    In order to comply with subsection (a) of this Code Section, each certified Court Reporter shall make inquiry regarding the nature of the contract for his or her services directed to the employer or the person or entity regarding said Court Reporter's services as an independent contractor.

49

1

**J U R A T**

2

3

4

5

6

_____

7

JOSH JESSUP

8

9

10

11

12

13

_____

14

Notary Public

15

16

17

18

Sworn and Subscribed to me

19

This ____7th____ day of ____JANUARY____ .

20

CONSTANCE J SCHULTZ
NOTARY PUBLIC
Fayette County, Georgia
My Commission Expires 9/6/2022

21

22

23

24

25

47

# ERRATA SHEET

Deposition of _Josh Jessup_          Date Taken _Nov 8, 2019_

| PAGE | LINE | CORRECTIONS |
|------|------|-------------|
| 15 | 11 | Certainly need to understand why they had that |
| 15 | 12 | question and what led them to have that question |
| 15 | 13 | and would provide as much clairification as we could |
| 38 | 8 | Brian San Souci |
| 41 | 17 | Shift bid process |
| 44 | 3 | Brian Sansauci |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

Sworn to and subscribed before me,
this the _7th_ day of _January_, 20_20_.

_Constance J Schultz_
NOTARY PUBLIC
My Commission Expires _9/6/2022_

_(SIGNATURE)_

CONSTANCE J SCHULTZ
NOTARY PUBLIC
Fayette County, Georgia
My Commission Expires 9/6/2022

## BULL & ASSOCIATES, INC.
**Court and Deposition Reporters**

# THE DELTA BRAND

## PASS TRAVEL—WITH GREAT PRIVILEGE, COMES GREAT RESPONSIBILITY

Our pass travel program is a privilege to enjoy and use responsibly. As a company, the primary mission we all share is to deliver paying customers to their destination safely, on-time and with their bags and cargo. We count on your professionalism to achieve that goal and to ensure that nonrevenue travelers do not distract from that goal.

Being able to share pass travel privileges with family and friends is yet another one of the perks of working at Delta. Each year, over two million pass riders fly more than six million flight segments using the pass travel program. Good travel etiquette, including appropriate attire, is expected of all nonrevenue passengers.

As always, it is your responsibility to ensure that pass riders connected to you—including travel companions and Buddy Pass Riders—use your privileges appropriately, exercise good judgment and follow Delta policy. Be sure to review the standby travel process guide with your family and friends before they travel. Visit DeltaNet and search for Jetiquette to find the general factsheet for detailing basic pass rider etiquette.

About this Handbook: The guidelines in this document provide examples of some of Delta's expectations as to the conduct, performance and appearance of Delta employees. Any list of this nature obviously cannot be all inclusive, and you must use your good judgment at all times. Seek the advice of your leaders if you have questions. Delta may choose to amend or change these guidelines at any time for any reason and employees are responsible for maintaining current knowledge of corporate guidelines, as well as guidelines used within their particular divisions.

28

Confidential - Subject to Protective Order                    DELTA 0000030

Page Navigation

A A A

# Delta Pass Travel Policy

## General Information and Restrictions

**Find Info Fast!**

More information is also available on the Pass Travel Site (Deltanet > HR > Pass Travel).

The Primary Pass Rider or PPR is the person whose direct relationship and employment status with Delta qualifies that person for Delta nonrevenue and reduced-rate transportation ("pass travel privileges"). This includes regular full- and part-time employees, Ready Reserve employees, retirees, eligible survivors of deceased employees, employees on approved short-term and long-term disability, approved leaves of absence, furlough and certain other inactive statuses.

The Internal Revenue Service (IRS) defines who is eligible for free pass travel privileges within Section 132(h) of the IRS Code. This includes the employee, spouse, dependent children and parents. In addition, Delta also provides privileges to nondependent children, travel companions, Domestic Partners and their children, and Buddy Pass riders ("Buddies").

Pass travel is a privilege granted to Delta employees, retirees and survivors and their eligible family members, designated travel companions, and Buddies. Pass travel privileges (other than those issued for official Company or government business) are to be used solely for leisure or emergency travel.

It is imperative that the information provided in this document be reviewed and understood by all Primary Pass Riders, their family members and designated pass riders who are eligible for pass travel.

**The Fine Print**

Any employee or pass rider who uses their pass travel privileges for personal business or other purposes not specifically permitted in this document, who engage in the barter, purchase or sale of such privileges, who fraudulently add individuals who are not eligible for pass privileges, or who violate any other provision of this document, will subject the responsible employee and the pass rider to disciplinary action, up to and including suspension of pass travel privileges and termination of employment.

Delta may deny or suspend these privileges to any current or former employee, or eligible pass rider or Buddy, whenever Delta deems such action to be warranted.

By using pass travel privileges for themselves or their family members, employees agree that all charges and penalties may be deducted from their pay, including from any final paycheck(s), and that any remaining balance is due to Delta upon termination of employment.

**Restrictions**

Delta's pass travel program is a privilege and one of the most generous pass travel programs in the industry. However, occasional situations of abuse dilute Delta's revenue and negatively affect legitimate travel use by other employees and their eligible pass riders.

**Eligibility**

If an individual is deemed ineligible for Delta pass travel, they are ineligible to participate in any type of pass travel privilege for themselves or as pass riders of any other Primary Pass Rider. For example, a person who was suspended from travel for disciplinary reasons may not become the designated Travel Companion of another employee or travel on Buddy Pass privileges of another employee. Individuals suspended from travel are also not eligible to purchase tickets under the Fly Confirmed for Less Program or ZED program.

An employee who is terminated for fraud, theft or similar offenses may not become any type of pass rider of another employee.

Commuting is allowed to and from work; however the following is prohibited for any traveler using pass travel privileges:

- Travel for any business activity or professional career whenever the cost of such transportation could be filed with the IRS as a business travel expense (see IRS Tax Topic 511).
- Traveling for independent business ventures or on behalf of an external company or organization. For example: Traveling in order to make a presentation at a trade show or convention, or traveling to transport animals, plants or merchandise for an external company or organization.
- Traveling if the cost of transportation could be reimbursed by an external company organization.

**Additional Restrictions**

Confidential - Subject to Protective Order

- Using Delta pass travel privileges to transport checked items on board an aircraft for which the pass rider has no intent to travel (in other words, you're not allowed to check a bag if you're not planning to fly).
- Nonrevenue standby travel is prohibited on any flight on the same day in the same market, same origin city, or same destination city for which a pass rider is holding or has held a confirmed reservation (whether or not the reservation is ticketed or previously canceled). This also applies to any confirmed SkyMiles award reservation, Fly Confirmed program reservation, confirmed employee award travel reservation or Company Business Reservation.
  Note: Co-terminals, such as JFK/LGA/EWR/HPN, are considered the same cities. A list of co-terminals can be found here.
- Travel for which the Armed Services provides a travel allowance.

## General Etiquette, Conduct and Dress Code

**Find Info Fast**

The "Jetiquette" Fact Sheet provides an overview of Pass Travel etiquette expectations.

All pass riders must conduct themselves in accordance with acceptable standards of business etiquette. When necessary, gate agents are authorized to deny boarding to any pass rider whose behavior is inappropriate.

Observe the following when using your pass travel privileges:

- Do your research. Always check for pass travel alerts, embargoes and baggage restrictions when you are planning your trip. Updates are posted regularly to the Alerts section of the Pass Travel site on the Employee Connection.
- Be kind to your fellow pass riders. Do not list on multiple flights on the same day of travel or on consecutive days to the same destination or to destinations within the same vicinity. Cancel your listings ahead of time if your plans change and you no longer plan to travel on a flight.
- Be discreet and professional. Avoid boisterous or boastful behavior. Any use of profanity is unacceptable.
- Do not allow your actions to identify you as a pass rider to our customers – however, if questioned, it is acceptable to discreetly identify yourself as a Delta employee.
- Do not engage in conversation with other passengers that would obstruct procedural and service duties of the gate agents, flight attendants or other on-duty staff.
- Respect your colleagues who are on duty by cooperating and complying with all rules and regulations. Observe all gate agent and in-flight crew instructions.
- Keep children seated and under control. The accompanying adult pass rider is responsible for the activities of their children to ensure they do not interfere with the comfort of other passengers or the service offered by flight attendants.
- Be sure to remind your Buddies that their travel is space available and that they may need to make alternative travel arrangements if space is not available on Delta flights.
- Since pass riders are often the last to board and space is limited, they are encouraged to travel light or to check their luggage when it exceeds carry-on size limitations. Federal regulations require that all checked luggage has identification attached.
- Please do not request special services or considerations from ground or in-flight personnel.

### Seat Assignment

- Accept your seat assignment and cabin assignment as issued by the gate agent or flight attendant without question or dispute. Once on board, if asked by on-duty personnel to relocate to another seat, cooperate fully and move as instructed. Any questions should be handled with your manager upon your return or by completing the Online Travel Survey.
- Do not ask other passengers to change their seating.

### Alcoholic Beverages

- Never overindulge in alcoholic beverages.
- Coach passengers must pay for all alcoholic beverages served as well as headsets on domestic flights. If seated in First class, Delta One or Comfort+ it is not acceptable to carry beverages, food or headsets to other pass riders seated in the coach cabin.
- Employees in uniform are prohibited from consuming alcohol.
- Do not carry drinks off the aircraft.

### Meal Service

- Never ask for additional or special meal service (i.e. salt-free, low calorie, etc.) and do not question or argue if your preferred selection of meal option is not available.

Confidential - Subject to Protective Order

DELTA 0000052

**Pass Penalty**

If a pass rider exceeds his/her S2 Priority allotments or uses an S2B Honor Roll or Perfect Attendance pass in an unauthorized manner, the Primary Pass Rider will be penalized $150 per day exceeded for domestic travel and $300 per day exceeded for transoceanic travel. This may also result in suspension of pass travel privileges and/or administrative action, up to and including termination of employment.

## Employees – Eligible Pass Riders and Allotments

The Internal Revenue Service (IRS) defines who is eligible for free pass travel privileges within Section 132(h) of the IRS Code. Eligible family members include legal spouse, dependent children and stepchildren, parents and stepparents. Domestic partners, children of domestic partners and a travel companion (in lieu of a spouse/domestic partner) may also be designated for pass travel. The value of their travel will be processed as imputed income. Employees' nondependent children are eligible for yield fare travel privileges.

## Adding, Updating Information or Removing Pass Riders

It is important for employees to inform Delta of any changes in the status of their eligible pass riders. Employees must report any life events within 60 days of the event.

## Spouse/Domestic Partner & Dependent Child Pass Travel

**Spouse Eligibility Criteria**

An employee and spouse are defined as those persons who are legally married and living together in the same household. If an employee and spouse do not live together either because they are divorced or separated, the spouse is not eligible to use any pass travel privileges. In cases in which two Delta employees are married to one another, the two employees and their eligible family members are eligible for travel on both the employee's own and the employee's spouse's pass travel privileges.

**Domestic Partner Eligibility Criteria**

An employee can designate an opposite or same sex Domestic Partner for pass travel privileges. Domestic Partner eligibility requirements include all of the following:

- Both are at least 18 years of age
- Neither is legally married (or the common law spouse) to any other person and neither is engaged in another domestic partnership
- Are not related by blood
- Reside together in the same permanent residence and have lived in a spousal type relationship for at least six consecutive months.
- Are financially inter-dependent

**Imputed income applies for travel by Domestic Partners.**

**Exception:** Delta employees and retirees will not be assessed imputed income for the value of pass travel used by their same or opposite sex domestic partner or spouse who is also eligible for tax-free travel as an employee or retiree of Delta (or Northwest), a Delta Connection carrier or a Delta Subsidiary. The employees should submit the Domestic Partner Family Status Change Form to the Employee Service Center within 60 days of the life event for approval of the imputed income exemption.

**Divorce, Death, Separation or Termination of Domestic Partnership**

When circumstances such as death, divorce or separation cause the eligibility of a family member to cease, the employee should notify the Employee Service Center within 60 days of the event so that pass travel privileges are revoked for the ineligible pass rider(s).

**Note:** Travel privileges ultimately belong to Delta and not the employee. A court may not award Delta pass travel privileges to an ex-spouse.

## Designated Travel Companions

Employees can designate a Travel Companion in lieu of their spouse/Domestic Partner. In this situation, the spouse loses all pass travel privileges (including Emergency S1A pass travel privileges).

**Imputed income applies for travel by Travel Companions.**

Confidential - Subject to Protective Order

11/29/2014  13:25   8593410752

4BT790035

DOC CODE: ACSRACADDDABAFBPICIA  Rev. 10/2013



## AFFIDAVIT OF OPPOSITE SEX DOMESTIC PARTNERSHIP
### (For Pass Travel Purposes Only)

By submitting personal data to Delta, you agree to allow Delta to process your personal data and to transfer your personal data to Delta's headquarters in Atlanta, Georgia, USA, or to any other location in the world for any purpose related to your employment with Delta, including, without limitation, to provide you with pass travel privileges. "Personal data" means any information relating to you or your employment with Delta. "Process" in relation to personal data means the following operations: collection, recording, organization, storage, amendment, retrieval, consultation, use, disclosure, erasure and similar operations.

(1) We, _MicHELLE  RACE_, employee, and _BRANDON  FREEMAN_ domestic partner, each certify and declare that we are each other's domestic partner as set out below:

- We are of opposite sex;
- We are both at least (18) years old;
- Neither of us is legally married (or the common law spouse) to any other person and neither of us is engaged in another domestic partnership;
- We are not related by blood or law;
- We reside together in the same permanent residence and have lived in a "spouse-like" relationship for at least six continuous months; and
- We are financially interdependent.

(2) We are enclosing evidence of our domestic partner relationship and our financial interdependence by providing one supporting document from the following:  Document showing shared primary residence, joint mortgage, lease or deed record, joint banking account or credit card, designation of the opposite sex domestic partner as durable power of attorney, or other similar documentation of financial interdependence.

(3) I, the employee, have an obligation to ensure that the Delta Employee Service Center (ESC) receives a Notice of Termination of Domestic Partnership from me if there is a termination of the domestic partnership, if the relationship fails to meet all of the requirements set forth in paragraph 1 above, or if there is any change in the relationship that makes this Affidavit invalid or erroneous. This Notice shall be provided to the ESC within 60 days of any of the events described in the preceding sentence.

(4) Regardless of whether I submit a timely Notice of Termination of Domestic Partnership form, I acknowledge that domestic partner pass travel privileges for my domestic partner and any eligible children of my domestic partner shall automatically terminate on the first to occur of the following: (1) the effective date of the termination of the domestic partnership, (2) the first date that any of the information in this Affidavit is erroneous or no longer valid or (3) the date the partnership fails to meet all of the requirements set forth in paragraph 1, above.

(5) I, the employee, understand that the providing of any fraudulent or false information in this Affidavit or the failure to notify the ESC of a termination of our domestic partnership is a violation of Delta policy and may subject me to disciplinary action, including but not limited to, the termination of my employment with Delta and the recoupment of the value of improperly provided travel.

DOC CODE: ACSRACADDDABAFBPICIA  Rev. 10/2013

Page 1 of 2

Confidential - Subject to Protective Order

 DELTA 0000102

11/29/2014  13:25  8593410752

4BT790035

(6) We understand that this Affidavit will be used for purposes of pass travel eligibility only. I, the employee, understand that I cannot enroll my opposite sex domestic partner for coverage under Delta's employee benefit plans, including, without limitation, Delta's healthcare plans.

(7) We understand that domestic partner pass travel privileges are subject to the terms and conditions described in Pass Travel on Delta Flights (formerly Human Resources Practices Manual 1014), as it may be updated from time to time, and Delta may deny or suspend these privileges to any current or former employee, or eligible pass rider, whenever Delta deems such action to be warranted.

(8) We understand that this Affidavit could have legal implications, for example, to the taxability of pass travel privileges provided. We understand that before signing this Affidavit we should seek competent legal and tax advice concerning such matters. We acknowledge that Delta has provided us with no advice in this regard.

We certify that the information we have provided regarding our domestic partner relationship is true and correct.

_Michelle Race_  
Employee Signature

Date _11/24/2014_

Employee's Printed Name: _MICHELLE RACE_

Employee (PPR) Number _082757700_ Employee's Date of Birth ▓▓▓▓

Employee's Address: _200 W. 34 TH ST._  
_LATONIA, KY. 41015_

_Brandon Freeman_  
Domestic Partner Signature

Date _11/24/2014_

Domestic Partner's Printed Name: _BRANDON FREEMAN_

Domestic Partner's Date of Birth ▓▓▓▓

Domestic Partner's Social Security Number/Gov't ID (required): ▓▓▓▓

Domestic Partner's Address: _200 W. 34 TH ST._  
_LATONIA, KY. 41015_

Date Domestic Partnership Began: _04/01/2014_

NOTARIZATION:

Notary Public: _Robert Sweeney_

My Commission Expires: _5/27/17_

When completed and notarized, submit along with the Employee Service Center (ESC) Opposite Sex Domestic Partner Family Status Change Form to:

Delta Employee Service Center, PO Box 52045, Phoenix, AZ 85072

Affidavit of Opposite Sex Domestic Partnership (Delta)  
DOC CODE: ACSRACADDDABAFBPICIA  Rev. 10/2013

Page 2 of 2

Confidential - Subject to Protective Order

DELTA 0000103

11/29/2014  13:25    8593410752

PAGE  02/8
4BT790035

▲ DELTA

### Employee Service Center (ESC) Opposite Sex Domestic Family Status Change Form

(Opposite Sex Domestic Partner/Opposite Sex Ex-Domestic Partner/Dependent/Nondependent Child of Opposite Sex Domestic Partner)

DOC CODE: ACSRACADDBABCFEPIHIF   Rev. 10/2013

By submitting personal data to Delta, you agree to allow Delta to process your personal data and to transfer your personal data to Delta's headquarters in Atlanta, Georgia, USA, or to any other location in the world for any purpose related to your employment with Delta, including, without limitation, to provide you with pass travel privileges. "Personal data" means any information relating to you or your employment with Delta. "Process" in relation to personal data means the following operations: collection, recording, organization, storage, amendment, retrieval, consultation, use, disclosure, erasure and similar operations.

Important: This form must be submitted and received by the ESC within 60 days of the life event or eligible family status change in order to add the opposite sex domestic partner and the eligible child of an opposite sex domestic partner for pass travel. Opposite sex domestic partners and opposite sex domestic partner children are eligible for pass travel only and are not eligible for health and welfare or any other Delta benefits.

### 1 - Employee Information

Employee Last Name (Surname): _RACE_    First Name: _MICHELLE_ Middle Name: _FAYE_ Current Date: _11/24/2_

Employee Number (Delta PPR): _082757700_   Dept./Station: _125 / CVG_

Employment Status: [✓] Active  [ ] Inactive  [ ] Retired  [ ] Other

### 2 – Action to be Taken for Opposite Sex Domestic Partner (DP)

**Action to be Taken:**

[✓] Add Domestic Partner (Provide Affidavit of Opposite Sex Domestic Partnership or other country-specific documentation, including supporting documentation as noted on Affidavit.
[ ] Remove Domestic Partner due to termination of relationship (Provide Notice of Termination of Domestic Partnership or other country-specific documentation)
[ ] Remove Domestic Partner due to death:     Date of Death _____
[ ] Correct or change Domestic Partner's personal information already on file. Correction to be made: _____

Ex-Domestic Partner's Current Mailing Address: _____

### 3- Opposite Sex Domestic Partner (DP) Personal Information

DP Full Legal Name: Last Name (Surname): _FREEMAN_    First Name: _BRANDON_ Middle Name: _MATTHEW_

Date Partnership Commenced: _04/01/2014_

Date of Birth (Month/Day/Year: _____  Social Security/Gov't ID Number (required): _____  Sex: [✓] Male  [ ] Female

[ ] Domestic Partner is employed by Delta, a Delta Connection Carrier or a Delta Subsidiary

DP Employment Status: [ ] Active  [ ] Inactive  [ ] Retired
DP Employee Number (PPR): _____
Carrier or Subsidiary Name: _____

Domestic Partner's Current Mailing Address: _200 W. 34TH ST._
_LATONIA, KY - 41015_

Page 1 of 3

Confidential - Subject to Protective Order    DELTA 0000104

9/14/2017                              SuccessFactors: PD - Final Corrective Action Notice (FCAN) for MICHELLE RACE

Performance ∨                                           MATTHEW MORRISON (00438128) on
                                                       behalf of MATTHEW ARLINGHAUS
                                                       (00142123)                    ∨

Reviews     Team Overview      Help & Tutorials

Back to: Un-Filed

## PD - Final Corrective Action Notice (FCAN) for MICHELLE RACE                ⏱ History   🖶   ⌖

   👤 MICHELLE RACE                                                           ♥ 0 ✎ 0
                                                                              Supporting

Route Map     Employee Information     Review Dates     Type     Summary     Acknowledgements

### Route Map                                                                                        Hide

┌········· Assessment ···········┐  ┌·············································· Signature ·····································┐  ┌···· Co
│                                │  │                                                                                    │  │
│  ①  Manager Assessment ⓘ      │  ②  Employee            ⓘ        ③  Manager            ⓘ        ④   C
│                                │       Acknowledgement                  Acknowledgement                              │
└────────────────────────────────┘  └────────────────────────────────────────────────────────────────────────────────┘  └─────







### Employee Information

| | | | |
|---|---|---|---|
| Last Name | RACE | First Name | MICHELLE |
| Title | RR_Ramp Agent | Personnel Subarea / Department | 1200 ACS Ops & Svcs |
| Hire Date | 04/26/2010 | | |
| Employee ID | 00827577 | Job Code | RR Ramp RR_Ramp Agent |
| Personnel Area / Station | CVG_OH_Cincinnati (1035) | Business Unit | Acs and Cargo Ops |
| | | Manager | MATTHEW ARLINGHAUS |

### Review Dates

| | |
|---|---|
| Originator: | MATTHEW ARLINGHAUS (00142123) |
| Review Period: | 12/17/2016 - 12/17/2019 |
| Due Date: | 12/17/2019 |

### Type

| | |
|---|---|
| Type | Compliance |

### Summary

In this section the leader will describe the issue or concern and define the impact to the organization, including specific examples.

| Manager Comments | To: Michelle Race<br>From: Matt Arlinghaus<br>Date: 12/17/2016<br>Re: Final Corrective Action Notice |
|---|---|

Michelle, on November 24, 2014, you submitted a request to
Delta asking that Brandon Freeman be designated as your
Domestic Partner for purposes of having access to your pass
travel benefits. In support of this request, you submitted an
Affidavit of Opposite Sex Domestic Partnership in which you
certified that that you and Mr. Freeman "reside together in the
same permanent residence and have lived in a spouse-like"
relationship for at least six continuous months, and are
"financially interdependent". In support of this request, you

Confidential - Subject to Protective Order                          DELTA 0000302

provided Delta with the first page of a bank statement indicating you and Mr. Freeman maintained a joint bank account. You also agreed to notify through a Notice of Termination of Domestic Partnership if your relationship failed to meet all of the requirements for a domestic partnership set forth in the Affidavit. Similarly, you acknowledged that Mr. Freeman's pass travel eligibility would automatically and immediately terminate as soon as your relationship failed to meet all of the defined requirements.

During recent depositions in a legal matter involving Mr. Freeman, Mr. Freeman identified his residence as an address different from yours. He also testified that his relationship with you is "on again off again" and that the two of you had been "taking a break" during the last three months. As part of this same proceeding, you claimed under oath that you and Freeman had lived together "on and off" for a couple of years but admitted that you have always maintained separate residences for which you each pay your own expenses, both before and after the date of your Affidavit. Furthermore, your only evidence of financial interdependence is a joint checking account that you share with Mr. Freeman. You described that account as a "Christmas Fund" and a review of the bank statements you produced demonstrate the account has never had a balance in excess of $100. These facts, as well as other testimony from you and Mr. Freeman regarding other romantic relationships and the birth of his child raise serious questions about the veracity of your certification that the two of you have lived in a spouse-like relationship.

Michelle, a review of these facts including the documentation you have provided has caused us to conclude you and Mr. Freeman do not meet the requirements of a Domestic Partnership. As a result, Mr. Freeman is being removed from your pass travel benefits, effective immediately. In addition, you are being presented this Final Corrective Action Notice to ensure you understand the importance of following Company pass travel rules and regulations. You must show immediate and lasting improvement in this important area of your job responsibility. Any further infraction of Company policy or failure to meet Company requirements may result in additional corrective action.

As a result of your conduct, Mr. Freeman is being removed from your pass travel benefits, effective immediately. In addition, all pass privileges for you and those remaining on your PPR will be suspended for a period of two years, commencing on today's date and ending on 12/15/2018. This suspension includes all remaining unused buddy passes for the current pass anniversary year and all for the next (2) pass anniversary years. You will receive your family and friends allotments on your pass anniversary date on April 26, 2019. Additionally, neither you nor others on your PPR should use non-revenue pass travel of any other employee. You will be allowed to continue to travel for business purposes.

Michelle, while you work towards showing lasting improvement in your performance and compliance with Delta's policies, for the next 36 months from the date of this notice, any transfer, promotion or special assignment that you bid for with ACS remains subject to file review. You will be ineligible for transfer, promotion or special assignment outside of ACS.

Michelle, it is imperative that you realize the seriousness of your situation and take immediate steps to ensure you follow all Company policies. While I am available to assist you in any way possible, the ultimate responsibility for improvement and compliance is yours.

Acknowledgements

Confidential - Subject to Protective Order    DELTA 0000303

9/14/2017                    SuccessFactors: PD - Final Corrective Action Notice (FCAN) for MICHELLE RACE

By including your electronic signature in this section, you are acknowledging that have read and fully understand the contents of this letter. Your signature does not indicate agreement.

Employee:

MICHELLE RACE                                                    01/13/2017

Manager:

MATTHEW ARLINGHAUS                                              01/14/2017

Send Copy

Copyright © 2017 SuccessFactors, Inc. All rights reserved. These online services are SuccessFactors confidential and proprietary and for use by authorized SuccessFactors customers only. Show version information.

Confidential - Subject to Protective Order                    DELTA 0000304

you let me know what you are doing to investigate this situation ? It is clearly retaliation because why would Delta be concerned whether Brandon cheated on me and had a child ? Especially when there is so much immoral behavior going on by the supervisors at Cvg and the fact that several supervisors are having sexual relationships with agents ,and not hiding it at all , and they still continue to have their spouses on their flight benefits, even though they are having sexual relationships on the side.

Brandon and I don't have any kind of situation like that and I am being picked on and singled out by the company. We have continued a real, and happy  relationship together all these years. We only want to be together with each other and nobody else.

Thank you,
Michelle Race
859-760-0009
Sent from AOL Mobile Mail


-----Original Message-----
From: SanSouci, Brian <brian.sansouci@delta.com>
To: Michellehaub@aol.com <michellehaub@aol.com>
Sent: Thu, Jun 29, 2017 09:24 AM
Subject: RE: My write up



Hello Michelle,

I've received word from HR that the FCAN is electronic and that your acknowledgement signature was also electronic. Pasted below is what was in the system:

To: Michelle Race
From:
Date:
Re: Final Corrective Action Notice

Michelle, on November 24, 2014, you submitted a request to Delta asking that Brandon Freeman be designated as your Domestic Partner for purposes of having access to your pass travel benefits. In support of this request, you submitted an Affidavit of Opposite Sex Domestic Partnership in which you certified that that you and Mr. Freeman "reside together in the same permanent residence and have lived in a spouse-like" relationship for at least six continuous months, and are "financially interdependent". In support of this request, you provided Delta with the first page of a bank statement indicating you and Mr. Freeman maintained a joint bank account. You also agreed to notify through a Notice of Termination of Domestic Partnership if your relationship failed to meet all of the requirements for a domestic partnership set forth in the Affidavit. Similarly, you acknowledged that Mr. Freeman's pass travel eligibility would automatically and immediately terminate as soon as your relationship failed to meet all of the defined requirements.

During recent depositions in a legal matter involving Mr. Freeman, Mr. Freeman identified his residence as an address different from yours. He also testified that his relationship with you is "on again off again" and that the two of you had been "taking a break" during the last three months. As part of this same proceeding, you claimed under oath that you and Freeman had lived together "on and off" for a couple of years but admitted that you have always maintained separate residences for which you each pay your own expenses, both before and after the date of your Affidavit. Furthermore, your only evidence of financial interdependence is a joint checking account that you share with Mr. Freeman. You described that account as a "Christmas Fund" and a review of the bank statements you produced demonstrate the account has never had a balance in excess of $100. These facts, as well as other testimony from you and Mr. Freeman regarding other romantic relationships and the birth of his

3

Confidential - Subject to Protective Order

child raise serious questions about the veracity of your certification that the two of you have lived in a spouse-like relationship.

Michelle, a review of these facts including the documentation you have provided has caused us to conclude you and Mr. Freeman do not meet the requirements of a Domestic Partnership. As a result, Mr. Freeman is being removed from your pass travel benefits, effective immediately. In addition, you are being presented this Final Corrective Acton Notice to ensure you understand the importance of following Company pass travel rules and regulations. You must show immediate and lasting improvement in this important area of your job responsibility. Any further infraction of Company policy or failure to meet Company requirements may result in additional corrective action.

As a result of your conduct, Mr. Freeman is being removed from your pass travel benefits, effective immediately. In addition, all pass privileges for you and those remaining on your PPR will be suspended for a period of two years, commencing on today's date and ending on 12/15/2018. This suspension includes all remaining unused buddy passes for the current pass anniversary year and all for the next (2) pass anniversary years. You will receive your family and friends allotments on your pass anniversary date on April 26, 2019. Additionally, neither you nor others on your PPR should use non-revenue pass travel of any other employee. You will be allowed to continue to travel for business purposes.

Michelle, while you work towards showing lasting improvement in your performance and compliance with Delta's policies, for the next 36 months from the date of this notice, any transfer, promotion or special assignment that you bid for with ACS remains subject to file review. You will be ineligible for transfer, promotion or special assignment outside of ACS.

Michelle, it is imperative that you realize the seriousness of your situation and take immediate steps to ensure you follow all Company policies. While I am available to assist you in any way possible, the ultimate responsibility for improvement and compliance is yours.


-----Original Message-----
From: Michellehaub@aol.com [mailto:michellehaub@aol.com]
Sent: Tuesday, June 27, 2017 12:30 AM
To: SanSouci, Brian <brian.sansouci@delta.com>
Subject: My write up

Brian,
When I last talked to you, you had asked me to send you a copy of the email/write up that Matt Arlinghaus read to me the day my benefits was taken away and I was placed on a final written for 2 years. I have been trying to get a copy of it from him and tonight he told me that he couldn't email it to me , or print it. So I wasn't able to get a copy to send to you. Could you let me know if you are able to get a copy of it on your own ? I would like you to read it and be aware of the things that someone accused me of and punished me for , without even asking me if they was true or false accusations . They never even investigated to find out if the things they was punishing me for was even true. I am not even aware of who was the person who took away my benefits based on false accusations. Before this even happened , I told Delta's attorney that if I was made to go to the deposition and tell what management had done , that they was going to retaliate against me in some way. And they did . This was clearly retaliation.
Michelle Race
859-760-0009

Sent from my iPad

4

Confidential - Subject to Protective Order

DELTA 0000322

From: SanSouci, Brian
Sent: Thursday, July 20, 2017 12:29 PM
To: 'michellehaub@aol.com' <michellehaub@aol.com>
Subject: RE: My write up

Hello Michelle,

According to Delta's records, Brandon's employment was terminated for a pass violation. Therefore, he should not, by Delta policy, be allowed to be utilize Delta passes. Specifically the policy states "If an individual is deemed ineligible for Delta pass travel, they are ineligible to participate in any type of pass travel privilege for themselves or as pass riders of any other Primary Pass Rider. For example, a person who was suspended from travel for disciplinary reasons may not become the designated Travel Companion of another employee or travel on his own Buddy Pass privileges or those of another employee. Individuals suspended from travel are also not eligible to purchase tickets under the Fly Confirmed for Less Program or ZED program."

Under these circumstances, I have concluded that allowing Brandon to continue to utilize your passes as a Domestic Partner was, in itself, a violation that should have been corrected. Adding to that your shared bank account containing no more than $100.00, your decision to retain ownership of two separate residences, and other factors indicate he did not qualify for designation as a Domestic Partner per the Affidavit of Opposite Sex Domestic Partnership document in which you certified that that your relationship met certain requirements when you added him to your passes. I have found no evidence that the company's decision to suspend you passes and issue your FCAN were motivated by a desire to retaliate against you for saying negative things about CVG leaders during deposition, or any other improper reason. The FCAN and suspension will therefore be upheld.

While I know you were hoping for a different outcome, please know that this is a consistent and appropriate application of Delta policy. We consider this investigation closed.

Thank you,

Brian B. San Souci | Manager – Equal Opportunity & Pass Travel | 1020 Delta Blvd, Dept 955, Atlanta, GA 30320 | Ph: 404.677.7740 | Fax: 404.677.2586 | brian.sansouci@delta.com

 DELTA
         

This communication constitutes an electronic communication within the meaning of the Electronic Communications Privacy Act, 18 U.S.C. Section 2510, and its disclosure is strictly limited to the recipient intended by the sender of this message. If you are not the intended recipient, any disclosure, copying, distribution or use of any of the information contained in or attached to this transmission is STRICTLY PROHIBITED. Please contact us immediately by return e-mail or at 404 677-7740 and destroy the original transmission and its attachments without reading or saving in any manner.

1

Confidential - Subject to Protective Order

From: michellehaub@aol.com [mailto:michellehaub@aol.com]
Sent: Monday, July 17, 2017 12:47 AM
To: SanSouci, Brian <brian.sansouci@delta.com>
Cc: michellehaub@aol.com
Subject: Re: My write up

This was the first time I had a chance to really look over my write up. The day that Matt Arlinghaus called me in the office and read this to me , I was in shock that Delta was doing this to me . But I had been fearing that they was going to do some kind of retaliation against me because I was made to appear to a deposition by Delta's attorney . When I received my subpoena I called the attorney and told him that I didn't want to go to the deposition because I still work at Delta and if I tell on management for all the bad things that they had done then they would find some reason to get rid of me the same way that they did Brandon Freeman. Delta's attorney said to me that nothing I say at the deposition can be used against me. Well that wasn't true because things that I said at the deposition was twisted and used against me and made false accusations about me which caused me to get falsely wrote up and got my benefits taken away . First off I was never talked to about the accusations in the write up. I was never given the chance to answer any questions or concerns Delta had about my life or my relationship with Brandon. Whoever wrote me up must of got information from a third party at the deposition. All the years that Brandon was on my benefits it was never a issue until after I told on management , then all of a sudden me and Brandon didn't meet the requirements. This is so untrue. In no way what so ever have I broken any rules. Yes Brandon and I own 2 houses. No where in the rule book does it say that couples are not allowed to own more than one property. There is a lot of employees that have more than one home. Pilots, Flight Attendants, commuters, all have more than one place that they stay. Many employees that work at Cvg have other homes. One example is a friend of mine is leaving tomorrow to go to his home in Wisconsin for 2 weeks. His wife is staying here in Cvg. Should he call (ESC) and let them know they will be apart ? Recently his wife was at their house in Wisconsin for over 2 months and he stayed here in Cvg. There are a lot of other people who have similar situations. I have talked to them and never have they had any problems from Delta because they own more than one home. When Brandon and I met we both owned a home. And we still own both of them. We live in my home. Some times we stayed at Brandons home . We both have to continue to pay the up keep on each home until we decide some day what we want to do. Eventually we plan on buying a different home together, but until we can get debt paid off that we both had before we met we have to keep what we have .
Me and Brandon have not lived apart since we started seeing each other. We are together every night ! except Brandon is a Fireman and he works 24 hour shifts and sleeps at the firehouse. In the affidavit that we filled out it had 5 things that was needed to qualify us as domestic partners. We qualified for all 5 things and we have continuously qualified for the 5 things.
In my write up the fact that Brandon has a child was in there. Yes he does have a child that lives with us and she is the joy of our life. I love this child as if I would of gave birth to her myself. Before writing me up for Brandon having a child I was never talked to about any concern Delta had about his child. Brandon was never in a relationship with another woman and he was never seeing another woman. I will not discuss his child any further but Brandon has full custody of his child and the Mom has never been in the picture. Delta is welcome any time to come to my home and see her room and all her things, and Brandons things and see how we live our life together. In Brandons deposition he said we was on again and off again. To him that means we have good days and we have bad days. Well I think all relationships have that. He said we was taking a break. Well we was. We was taking things slow and trying to adjust to life with a baby. It is a major life change when you have a baby. But through everything we have always been together, lived together, and we sleep in the same bed together every night. This is how we plan on spending our life, together. We couldn't be any happier together , than we are right now. This is why I need to find out what my next steps are going to be to have these false accusations removed from my file , and my benefits reinstated ,
Because this retaliation against me is unfair and untrue and I don't deserve what has been done to me . Could

2



From:            Morrison, Matthew J
Sent:            Tuesday, January 24, 2017 10:06 PM
To:              Race, Michelle F
Subject:         RE: CVG visit

Hello Michelle,

You probably noticed from my out of office assistant message that I was in CVG last Thursday and Friday. It is unfortunate that we were not able to meet last week while I was in the station. To answer your question, you can feel free to appeal the Final Corrective Action Notice with suspension of Pass privileges to Delta's Equal Employment department. Mr. Brian San Souci is the manager of the department and can review your written appeal - his contact details are below. Please keep in mind that when appealing the Corrective Action, you will want to provide Mr. San Souci with the relevant details of your situation and the reason(s) you feel that the action taken should be reconsidered. I have noted his email address below for you to submit the appeal.

If you would like to discuss the appeals process further, feel free to call me at 404 773 5352.

Regards,

Matt

Brian San Souci
Manager, Equal Opportunity and Pass Protection Brian.Sansouci@delta.com
404 677 7740

-----Original Message-----
From: Race, Michelle F
Sent: Friday, January 20, 2017 3:17 PM
To: Morrison, Matthew J <matt.morrison@delta.com>
Subject: FW: CVG visit

From: Race, Michelle F
Sent: Friday, January 20, 2017 3:14 PM
To: Race, Michelle F
Subject: RE: CVG visit

Matt I never heard back from you on how I can file a appeal or who I need to contact . I don't want this in my file especially when I haven't done anything wrong. Before I went to the deposition I called Delta's attorney and I told him that I did not want to have to go to the deposition because if I answer the questions and I tell on the managers then I will some how be punished by Delta for telling ,, and I told him that I enjoy my job at Delta , and I have a good work record . I was then told by him that I had no choice , that I had to appear at the deposition because I was supenoed ., he then said that nothing that would happen to me. That wasn't true because a few weeks after my deposition I was retaliated against and bits and pieces was taken out of things said in my deposition and they was turned around and

1

Confidential - Subject to Protective Order                    DELTA 0000352

falsely used to accuse me of lying . I need to find out who I need to talk to about getting this fixed. It is unfair what has been done to me . I haven't been able to travel, and I wasn't able to be on the shift bid committee, and I wasn't able to put in for a job that was available in the sky club because of these false allegations. I will be at Cvg on Friday, Saturday, Sunday this week . From 6p.muntil 12:30a.m. And next week I will be at Cvg on Thursday,Friday,Saturday, and Sunday from 6:00a.m. Until 12:30 p.m. Please let me know who I need to contact.

From: Race, Michelle F
Sent: Friday, January 13, 2017 3:37 PM
To: Morrison, Matthew J
Subject: RE: CVG visit

_____yes I will send that shortly. But I would like to also ask what is the proper way to put in for an appeal if you have been wrongly punished  and acussed of something you didn't do ?? Is there some kind f paperwork I need to fill out? Like I said, I was never talked to abut any of this, nobody  even asked me any questions before they formed a opinion and  wrote me up on a final written and took away my flight benefits. I have I have no prior write ups,, no prior disciplines, and now I have this false stuff in my file . I wanted to make sure I was following the right procedure so these accusations can be corrected .

Michelle Race _____
From: Morrison, Matthew J
Sent: Friday, January 13, 2017 2:59 PM
To: Race, Michelle Fe
Subject: CVG visit

Hello Michelle,

With the tragic events that occurred late last week,  my plans for this week changed and I was not able to travel to CVG. Could you provide me with the days and times that you are will be working at the station over the next couple of weeks. If our schedules can align, it would be good to discuss while I'm in CVG.

Thanks,

Matt

-----Original Message-----
From: Race, Michelle F
Sent: Friday, January 06, 2017 4:24 PM
To: Morrison, Matthew J <matt.morrison@delta.com>
Subject: RE: I have not heard back from you

Matt yes I would like to meet with you. I still don't understand how things that was answered in our depositions have been twisted and turned into this. I don't understand how I can be punished because of the fact that we own 2 houses. Brandon has went through a bankruptcy and financial restructure and isn't allowed to sell or rent his property for years. And he has money that comes out of his account automatically  for other payments to places that was agreed upon in his bamkrupcy. So we have no choice but to keep Brandon's property until the terms of his bankruptcy is over. At that time we plan on selling it. The motorcycles are 2 major purchases that we have made together and sharing the monthly responsibility of the payments and insurance that we have required because it is a enjoyment that we share together. I don't understand how you can say we don't have a spouse like relationship. We live together, and we have a child that we are raising together. My home is the only home that she knows. Everything that she owns is at my home. I might not have gave birth to her , but I couldn't Love her any more if I would have. Brandon has full custody of her and she has never seen her Mother and never will. I take care of her when Brandon is working and my Mother watches her when we both work. My parents treat her just like one of their Grandchildren. Me and Brandon live together, shop together, have all meals together, sleep in the same bed together. We make sure to pay all of our bills. no we don't usually have a lot of money in our account together. Money goes in each and every month but it goes out also. By the time that all my bills

2

Confidential - Subject to Protective Order                    DELTA 0000353

are paid and all his bills are paid and we have bought everything the baby needs each week we never have any money left over. I Love Brandon and would never want to be with anyone else. Brandon feels the same about me. Yes he cheated one time. We have been working on trusting again. But we are working on it together. You make it sound like because Brandon said our intimate /sexual relationship was on again /off again, because of the fact that it is hard working through the fact that not only did Brandon cheat one time , but that one time that he did, he had a baby by that person. So I believe this would be hard for anyone to work through. But we are. No relationship is perfect. And all relationships are different. Our relationship has had some difficult times. But we have managed to stay together 6 years, and we plan on staying together the rest of our life. I wouldn't want to be with anyone else. You should spend some time at Cvg in the break room and listen to some of the people talk about their marriages and relationships. Most of them are either fighting or cheating. So I feel my relationship is a lot better than most of them that Delta isn't harassing and judging . We are a couple who is in a committed relationship with each other and with a child together. I have asked pretty many people so far at work that are just living with someone  how much money they have together in their bank account and most of them have said their accounts are separate that they don't even have a account together. So I'm not really sure on the amount of money  that is expected from a average couple to keep, I never saw a dollar amount in the policy. I wasn't aware we had to keep a certain amount. We do share monthly bills together and monthly expenses. We share all the grocery bills together, , any store items we use each day for laundry, personal care, eating out, all that expense is shared together. So again, I don't understand how you can judge our relationship . As long as we are happy together, and we are raising a healthy and happy baby together, and we are only committed to each other,, how can we be discriminated against ,, and me be punished for it.. Please let me know when you will be available to meet. I am a good and honest person and a good employee,, and I don't deserve what I am being put threw at Delta right now.
Michelle Race

---

From: Morrison, Matthew J
Sent: Thursday, January 05, 2017 10:14 PM
To: Race, Michelle F
Subject: FW: I have not heard back from you

Hello Michelle,


I am happy to review any concerns you have.  My apologies for the delay in getting back with you during this holiday period and thank you for providing the information for additional review.  I have had the opportunity to review the Final Corrective Action letter and the information you provided including the concerns you outlined.  I wanted to speak to you in person, but won't be able to be in CVG until next week so I will respond in email and am happy to talk face to face when I am there next week.


Regarding your concerns about your Final Corrective Action letter and the suspension of your flight benefits, I have reviewed the information you provided and also taken the opportunity to review the basis for this level of corrective action.  Based on the information I have been provided, both you and Mr. Freeman provided information under oath that indicated you did not meet Delta's requirements for Domestic Partnership.  Specifically, residing together in the same permanent residence, in a "spouse-like" relationship, and financial interdependency.  The information you provided to me appears to be consistent with the statements that I understand you and Mr. Freeman made under oath that acknowledged having maintained separate residences with each of you paying your own expenses and that the relationship was "on again off again" or "on and off".

3

Confidential - Subject to Protective Order

DELTA 0000354

I recognize that you mention in your email that you make payments out of your bank account for insurance payments for Brandon's two motorcycles, however this alone does not meet Delta's financial interdependency requirement for a qualifying spouse-like domestic partnership that would allow domestic partner flight privileges.

When Delta learns that violations are/or have occurred with Pass Travel or other policies/procedures, it has a duty to act. Once the information is received and the situation reviewed, the appropriate level of corrective action is administered and when flight privileges are involved suspension of flight privileges is normally part of the corrective action. You mention in your message below that you feel this is harassment and retaliation. I wanted to let you know that from an HR perspective, this level of discipline is consistent with similar infractions that can lead to discipline up to and including termination of employment. Each case is reviewed and decisions are based on the individual circumstances of the infraction. In your case, the decision was made to administer the Final Corrective Action Notice and suspend flight benefits. Based on this information I believe this to be an appropriate and consistent with similar situations. However, if you have any additional information that has not been taken into consideration or that is misunderstood in the above please provide that information to me and I will be happy to review that as well.

Although this is a very serious level of Corrective Action and will necessitate your full attention to ensure no further infraction of Company policy or any failure to meet Company requirements, I have seen employees recover and have long and successful careers with the Company.

Regards,

Matt Morrison

HR Manager

-----Original Message-----

From: Race, Michelle F

Sent: Wednesday, January 04, 2017 1:48 PM

To: Morrison, Matthew J <matt.morrison@delta.com<mailto:matt.morrison@delta.com>>

Subject: RE: I have not heard back from you

Matt,

4

Confidential - Subject to Protective Order                    DELTA 0000355

I sent you a email and asked you what steps I need to take in order to appeal the unfair decision to put me on a final written and take away my flight benefits. I want to make sure you received my email and I am waiting to find out what steps I need to take next .

Thank you,

Michelle Race

————————————————————

From: Morrison, Matthew J

Sent: Tuesday, December 27, 2016 3:35 PM

To: Race, Michelle F

Subject: Automatic reply:


Hello, I am currently out of the office for the Christmas Holiday.  I plan to respond to messages upon my return to the office on Thursday, 12/28.   If this is an urgent matter, you may contact me via cell.


Regards,


Matt Morrison

404 773 5352 o

404 697 3730 c

5

Confidential - Subject to Protective Order                    DELTA 0000356



△ DELTA ⏀

Ryan D. Langel
Special Counsel

Delta Air Lines, Inc.
1030 Delta Boulevard
Atlanta, GA 30354-1989
T. 404 715 8718
F. 404 677 7022
ryan.langel@delta.com

October 2, 2017

VIA DIGITAL CHARGE SYSTEM
& FIRST CLASS MAIL

Sharon Poindexter, Senior Federal Investigator
U.S. EEOC – Indianapolis District Office
101 West Ohio Street, Suite 1900
Indianapolis, Indiana 46204-4203

RE: **Michelle Race v. Delta Air Lines, Inc. – EEOC Charge No. 470-2017-01220**

Dear Ms. Poindexter:

Delta Air Lines, Inc. ("Delta") submits this position statement[1] in response to the above-referenced charge of discrimination filed by Michelle Race. Thank you for allowing Delta extra time to respond to this matter. As the Commission knows, Ms. Race is alleging that she has been discriminated against based upon her race/color, sex, and national origin. She also alleges that she was retaliated against. Specifically, Ms. Race claims that she was disciplined and denied training for filing a previous charge of discrimination[2], for the deposition testimony she provided during a former Delta employee's lawsuit, and for her relationship with a former Delta employee. For the reasons set forth below, Ms. Race's allegations are without merit and her charge of discrimination must be dismissed.

## DELTA'S NON-DISCRIMINATION AND NON-RETALIATION POLICIES

Delta is firmly committed to a policy of equal opportunity, non-discrimination and non-retaliation. Delta prohibits all forms of unlawful discrimination, including discrimination based on race, color, religion, national origin, creed, age, sex (including pregnancy), disability, genetic information, marital status, sexual orientation, gender identity, citizenship status, parental status, veteran status or other characteristics that may be protected by law, as well as harassment and retaliation (*See* Attachment A). Delta's non-discrimination and non-retaliation policy is readily accessible to each employee. It is included in Delta's *The Way We Fly* manual and Code of Ethics and Business Conduct, is posted on Delta's intranet and in numerous places frequented by employees throughout Delta's operations, and is a frequent subject of discussion at employee briefings and other meetings.

---

[1]     The statements set forth in this letter are being submitted based on Delta's current understanding of the facts and solely for the purpose of cooperating with this investigation. This statement, although believed to be true and correct, does not constitute an affidavit and is not intended to be used as evidence of any kind in future proceedings. By submitting this information, Delta does not intend to waive any defenses it may have to the allegations or in any way prejudice itself with respect to any issue, whether procedural or substantive in nature, and expressly reserves the right to assert additional defenses not included in this response. Delta also requests that the Commission treat the information contained in this letter, and attachments hereto, as confidential records.

[2]     By way of background, in or around September 2014, Ms. Race filed EEOC Charge number 473-2014-01349 with the Cincinnati Area Office for the U.S. Equal Employment Opportunity Commission. Following an investigation, the Commission issued a determination finding that the evidence did not substantiate that Delta violated the applicable statutes and dismissed Ms. Race's charge in June 2015.

Sharon Poindexter, U.S. EEOC
October 2, 2017
Page 2

Delta employees who believe that they have been subjected to discriminatory or unfair treatment are encouraged to notify Delta via various methods. Employees can report their concerns to representatives of Delta's Human Resources and/or Equal Opportunity departments or through Delta's Ethics & Compliance Helpline. Importantly, any concerns reported to the Helpline or through any of the other options described above, including any concerns reported directly to an employee's supervisor or manager, are done so without fear of retaliation (*See* Attachment B).

## DELTA'S NON-REVENUE PASS TRAVEL POLICY

As an airline, Delta is able to provide its employees and certain eligible family members with free and reduced-rate travel (also known as "nonrevenue" travel) on Delta flights. In general terms, Delta allows each employee and her eligible pass riders (parents, step-parents, spouse, Domestic Partner or "Travel Companion", and dependent children) to travel standby on any Delta flight if there are empty seats available on the aircraft. These travel privileges are a generous and widely-used employee benefit, and Delta takes seriously any misuse or violation of its nonrevenue travel policy.

Delta permits employees to designate an opposite or same-sex Domestic Partner for pass travel privileges. In pertinent part, to qualify as a Domestic Partner, the employee and his or her designee must: (1) reside together in the same permanent residence and have lived in a spousal-type relationship for at least six consecutive months; and (2) be financially interdependent. Unlike Travel Companions, Domestic Partners are not required to pay yield fare charges when booking nonrevenue travel; rather, the value of the travel is treated as imputed income to the Delta employee. Thus, the resulting imputed income charges are generally less than yield fare charges making a Domestic Partner designation financially desirable.

Employees are under a continuing obligation to ensure that their pass rider designees maintain their eligibility and that Delta is timely notified of any changes in a pass rider's status. For example, when a married employee divorces or stops living together in a spouse-like relationship, Delta expects the employee to submit the appropriate documentation to Delta removing the former spouse as an eligible pass rider. Relatedly, employees who designate a Domestic Partner are expected to remove and/or modify their partner from their pass travel records upon the end of the relationship or in the event they no longer meet the requisite eligibility criteria of residing together in a spouse-like relationship and maintaining financial interdependence. Failure to do so can lead to the suspension of an employee's pass travel privileges and routinely results in disciplinary action up to and including termination.

## FACTUAL SUMMARY

Ms. Race was hired by Delta on April 26, 2010, to work as a Ready Reserve[3] Customer Service Agent ("CSA") in Department 120 at Delta's Cincinnati/Northern Kentucky International Airport ("CVG Airport") operations in Hebron, Kentucky. Ms. Race currently works as a Ready Reserve CSA at CVG Airport. Generally speaking, agents in Department 120 perform a variety of physically demanding duties on the busy terminal ramp areas of the airport or in the Delta bag room.

---

[3]    Ready Reserves are part-time employees who work during peak operational times/seasons.

Confidential - Subject to Protective Order                     DELTA 0000288

Sharon Poindexter, U.S. EEOC
October 2, 2017
Page 3

In April 2012, Ms. Race added Brandon Freeman to her pass privileges as her Travel Companion. In late November 2014, Ms. Race requested to upgrade Mr. Freeman from her Travel Companion to her Domestic Partner. This designation would permit Mr. Freeman to book travel without having to pay the yield fare; instead, the value of the travel was treated as imputed income to Ms. Race and taxed accordingly. By designating Mr. Freeman as her Domestic Partner, Ms. Race signed an Affidavit on November 24, 2014 affirming that she and Mr. Freeman resided together in the same permanent residence, had lived in a "spouse-like" relationship for at least six continuous months, and were financially interdependent. To evidence their financial interdependence, Ms. Race provided a November 2014 bank statement indicating that she and Mr. Freeman held a joint checking account (*See* Attachment C). In the Affidavit, Ms. Race agreed to notify Delta if the relationship failed to meet all the eligibility requirements and acknowledged that failing to notify the Company of the termination of her Domestic Partnership was a violation of Delta policy and may subject her to disciplinary action, including but not limited to, the termination of her employment with Delta (*See* Attachment D).

In late 2016, during depositions in a legal matter involving Mr. Freeman, Mr. Freeman identified his residence at a different address than where Ms. Race resides. He also testified that his relationship with Ms. Race was on again off again, and that the two of them had been taking a break during the last three months. During the same proceeding, Ms. Race stated under oath that she and Mr. Freeman had lived together on and off for a couple of years, and admitted that they had maintained separate residences for which each paid their own expenses, both before and after the date of the earlier November 2014 Affidavit. Further, the only evidence of financial interdependence was the joint checking account that she shared with Mr. Freeman, which she described as a "Christmas Fund" that never held a balance in excess of $100. These facts, as well as other statements from Ms. Race and Mr. Freeman regarding other romantic relationships and the birth of his child, raised serious questions about the truthfulness of Ms. Race's certification that she and Mr. Freeman met the eligibility requirements to maintain Domestic Partner pass travel benefits. After reviewing these sworn statements as well as Ms. Race's original Affidavit, Delta concluded that Ms. Race and Mr. Freeman did not meet the eligibility requirements to maintain Domestic Partnership for pass travel purposes.

Needless to say, Ms. Race's conduct -- either in falsely certifying that she and Mr. Freeman met the requirements of a Domestic Partnership in November 2014 or in failing to notify Delta when she and Mr. Freeman no longer met the requirements of same -- is a serious offense that frequently results in termination of employment. While Delta certainly had a legitimate basis to terminate Ms. Race's employment for this violation, the company opted instead to issue a Final Corrective Action Notice ("FCAN") and allowed her to retain her job (*See* Attachment E).[4]

## DELTA'S RESPONSE TO MS. RACE'S ALLEGATIONS

Ms. Race alleges that she was discriminated against based upon her race/color, sex, and national origin. She also alleges that she was retaliated against for filing a charge of discrimination in 2014[5],

---

[4]   Ms. Race subsequently appealed the FCAN to Delta's Equal Employment & Compliance department through the company's Open Door Policy. Ms. Race failed to produce evidence to support that she and Mr. Freeman met the eligibility requirements.

[5]   As an initial matter, the courts have recognized that the passage of several months, let alone several years, between the alleged protected activity and adverse action defeats a retaliation claim. Here, Ms. Race's EEOC charge was filed in September 2014, but any of the alleged unlawful actions set for in the Charge did not occur until late 2016 -- a full two years later.

Confidential - Subject to Protective Order

Sharon Poindexter, U.S. EEOC
October 2, 2017
Page 4

for the deposition testimony she provided in a legal proceeding regarding a former Delta employee, and for her relationship with that former employee. These allegations, however, are without merit

As demonstrated above, all actions taken by Delta regarding Ms. Race's employment were appropriate and had nothing to do with any protected characteristic and/or protected activity. As discussed above, in November 2014 Ms. Race designated Brandon Freeman as her Domestic Partner for purposes of having access to her pass travel benefits. In support of this request, Ms. Race submitted an Affidavit certifying that she and Mr. Freeman resided together in the same permanent residence, had lived together in a spouse-like relationship for a least six continuous months, and were financially interdependent. She also certified that she would notify Delta if at any point their relationship failed to meet all eligibility requirements set forth in the Affidavit she signed in November 2014. Additionally, the Affidavit specifically warned Ms. Race that a failure to timely notify Delta of a change in her relationship could result in termination of employment. Despite this, in 2016 Ms. Race provided statements under oath indicating that they did not meet the eligibility requirements set forth in the Affidavit. Specifically, Ms. Race admitted that she and Mr. Freeman had lived together on and off for a couple of years and had always maintained separate residences for which they paid their own expenses, both before and after signing the Affidavit. Thus, Ms. Race violated Delta policy by failing to notify Delta that her relationship with Mr. Freeman no longer (if ever) met the eligibility requirements for a Domestic Partnership for purposes of pass travel. Although Delta has terminated other employees for this same infraction, the company elected not to do so in Ms. Race's case and instead demonstrated leniency by allowing her to retain her job. Based on these facts, Delta's decision to issue a Final Corrective Action Notice to Ms. Race was warranted and entirely justified.

In an attempt to create a claim of discrimination where none exists, Ms. Race alleges that she was not properly notified of a de-icing class and that she was called into the supervisor's office to discuss that she was not meeting an average 40 hours per week. In addition to being contrary to the factual record, neither of these allegations support that Ms. Race was discriminated or retaliated against in any manner. In December 2016, Ms. Race's supervisor met with to remind her that as a Ready Reserve employee she, like all other Ready Reserves, is required to work at least 600 hours annually.[6] As for Ms. Race's allegation that she was not informed about a deicing class, all agents who bid for the deicing shift bid were scheduled that day for an upcoming deicing class. Agents also had the option to sign up for the class. Class schedules were posted in the operation and agents were briefed to review the class schedules to look for their assigned class. Thus, Ms. Race's suggestion that Delta somehow failed to notify her of the training as an act of retaliation is simply not credible.

Because Ms. Race cannot rebut Delta's legitimate, non-discriminatory and non-retaliatory reasons for any actions taken regarding her employment, these allegations of discrimination are without merit and must be dismissed.

CONCLUSION

As demonstrated above, Ms. Race's allegations are without factual and legal merit. Delta therefore respectfully requests that the Commission dismiss this matter without further action. If you have

---

[6]    Ms. Race was coached at various points in 2016 regarding the hourly work requirement for Ready Reserve employees because she was at risk of failing to meet this requirement, which would have resulted in termination of her employment.

Confidential - Subject to Protective Order                    DELTA 0000290

Sharon Poindexter, U.S. EEOC
October 2, 2017
Page 5

any questions about the foregoing or this charge of discrimination in general, please do not hesitate to contact me at (404) 715-8718.

Sincerely,

*Ryan D. Langel*

Ryan D. Langel

Confidential - Subject to Protective Order

DELTA 0000291