UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
COVINGTON DIVISION

MICHELLE RACE                          :
                                       :
        Plaintiff,                     :        Case No: 2:18-CV-00094-WOB-CJS
                                       :
V.                                     :
                                       :
DELTA AIR LINES, INC.                  :
                                       :
        Defendant.                     :

PLAINTIFF'S RESPONSE TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT

Comes now the Plaintiff, by and through counsel, and for her Response to Defendant's

Motion for Summary Judgment states as follows:

I.      INTRODUCTION

Defendant moves the Court to grant it summary judgment on Plaintiff's claims in this

matter. Plaintiff brings three claims against the Defendant. (Doc.1). The first two claims concern

allegations of racial discrimination and/or harassment under 42 U.S.C. § 2000e-2, KRS §

344.040, and 42 U.S.C. § 1981. *Id.* The third claim alleges a retaliation claim under 42 U.S.C.

§2000e-3 and KRS § 344.280. *Id.* As it concerns the Plaintiff's first two claims involving racial

discrimination and harassment, Defendant contends she cannot establish a *prima facia* case of

racial discrimination or harassment, and she cannot refute the Defendant's reasons for putting her

on a Final Written Warning. (Doc. 31, pg. 4). Defendant further contends that her retaliation

claim fails because of its "legitimate" reason for disciplining her, and because she cannot

establish causation between the discipline and her alleged protected activity. (Doc. 31, pgs. 12,

14). Defendant's motion should be denied.

## II.      COUNTERSTATEMENT AND SUMMARY OF RELEVANT FACTS

### A.  The Plaintiff's employment with the Defendant.

Michelle Race has been employed with the Defendant since 2010. (Doc. 34, pg. 20). She is employed as a below the wing ("ramp") agent in Defendant's customer service department at the Cincinnati/Northern Kentucky International Airport ("CVG"). (Doc. 33, pg. 5), (Doc. 34, pg. 13, 20). Throughout her employment with Defendant, she has been an exemplary employee as referenced by consistent excellent performance reviews. (Doc. 34, pg. 21). She is a part time employee of Defendant, and for her work she receives an hourly wage and "flight benefits." *Id.* Importantly, these are the only forms of wage and benefits she receives from the Defendant for her work. *Id.* Flight benefits are a program offered by Defendant to its employees whereby employees "have the ability to travel standby on Delta flights if a seat's available for themselves and certain family members." (Doc. 33, pg. 9). Additionally, employees are offered "friend and family passes" to a limited number of family and friends. *Id.*

The Plaintiff's employment with the Defendant began experiencing difficult times following her decision to start a romantic relationship with her co-worker, Brandon Freeman, sometime in 2011. (Doc. 34, pg. 29-30 and Ex. 7). Brandon Freeman is African-American and the Plaintiff is Caucasian. (Doc. 34, pg. 49). According to the Plaintiff, when certain employees of the Defendant became of aware of the relationship they were not happy about it. *Id.* On September 26, 2014 the Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") detailing her treatment by Delta employees following the start of her relationship between 2011 and 2014. (Doc. 48, Ex. 7).

**B. The Plaintiff's September 26, 2014 Charge of Discrimination.**

The Plaintiff was subject to routine criticism and harassment by co-workers concerning her relationship with Mr. Freeman. She testified to the following incidents, which she reported to the EEOC via her first Charge of Discrimination:

1) A 2011 interaction with Doug Howe who questioned why she would go on vacation with Mr. Freeman, and co-worker Dave Gosney commenting to her that he thought she was "smarter than that." (Doc. 34, pg. 51, Ex. 7);

2) A conversation wherein Mr. Howe commented that he could watch Mr. Freeman burn in a fire. (Doc. 34, pg. 52, Ex. 7);

3) A meeting with Defendant employees Chuck Jones and Greg Kuhns where they informed the Plaintiff they had received safety concerns for the Plaintiff because of Mr. Freeman. (Doc. 34, pg. 54, Ex. 7). In this meeting the Plaintiff was asked whether she and Mr. Freeman were having sex, and following her admission that they had, Mr. Howe threw a folder at her and asked her why she would do that. Additionally, she noted Mr. Kuhns' comments that she should not date black men. *Id.*;

4) Pressure from Mr. Jones and Mr. Kuhns to file an Emergency Protective Order and a police report against Mr. Freeman, refusal to do she believed would result in a negative consequences at work. (Doc. 34, pg. 61, Ex. 7). She testified Mr. Jones told her she could not return to work until she complied and filed something against Mr. Freeman. (Doc. 34, pg. 65, Ex. 7);

5) Pressure from Delta employees to implicate Mr. Freeman for misusing her password to gain access to swap work shifts with the Plaintiff, and in return they would not attempt to have her fired. (Doc. 34, pg. 59, Ex. 7);

6) Following Mr. Freeman's termination from employment with Defendant in April 2014, she describes a conversation with co-workers in which Mr. Howe relates that he knew Mr. Freeman had filed his own EEOC charge, and suggesting she tell anyone that asks that Mr. Freeman was treated well at Delta. Further, she was told by another co-worker that she was not talking to Mr. Freeman anymore. (Doc. 34, pg. 67-68, Ex. 7);

7) A change in work rules called the "Brandon Freeman rules" reversing a work policy which previously made black employees work unfavorable assignments more than their white counterparts as well as an unequal enforcement of work rules. (Doc. 34, pg. 69-70, Ex..7);

8) Following her report to Defendant's EEO office concerning her belief that Mr. Freeman was discriminated against and harassed, Defendant employees ignored her report, and instead, she received a direct threat in the form of a letter appearing in her work locker ("Do Not Talk to Them"). (Doc. 34, pg. 76-81, Ex. 7 and 8).

9) She expressed to the EEOC that she was "afraid to come into work at Delta," "I am afraid of harassment," and "I am afraid of losing my job." (Doc. 34, Ex. 7).

The Plaintiff also testified that she received a second note in her locker that read "wrong choice." (Doc 34, pg. 82). Ultimately, the Plaintiff decided not to pursue this EEOC charge. (Doc. 38, pg. 259). It is against this backdrop, however, that the employment related events contained in the Plaintiff's Complaint are set.

### C. Defendant's Flight Benefits Policy - The Plaintiff adds Brandon Freeman as a Domestic Partner under her Flight Benefits.

As part of her compensation package with the Defendant, the Plaintiff received flight benefits, which as earlier described, consist of "the ability to travel standby on Delta flights if a seat's available for themselves and certain family members." (Doc. 33, pg. 9). A subset of this benefit concerns employees and their "domestic partners." (Doc. 33, pg. 10).

The Defendant designated Josh Jessup as its representative from Plaintiff's deposition request under Fed.R.Civ.P 30(b)(6) to answer questions related to topics provided in Plaintiff's deposition notice. (App. A). Mr. Jessup was designated to answer all of the topics covered. (Doc. 33, pg. 4). He agreed to be so designated, and agreed he was prepared to testify concerning the issues. *Id.* Two of the issues noticed to be covered concerned the administration of flight benefits available to the Plaintiff during her employment with the Defendant, and to the training of employees relative to the program. (App. A, pg, 2, para. J and K).

Under the Defendant's Domestic Partnership program, employees and their significant others that live in a "spouse like" relationship and meet five requirements are eligible for the benefit. (Doc. 33, pg. 10), (Doc. 33, Ex. 1 and 2). According to Defendant's Domestic Partner

flight benefits policy and Affidavit necessary for approval of the benefits, the employee and the domestic partner must be 18 years old, not legally married or engaged in another domestic partnership, not related by blood, residing in the same permanent residence and living in a "spouse-like" relationship for at least six continuous months, and financially interdependent. (Doc. 33, pg.16, Ex. 1 and 2).

In order to sign up for domestic partner flight benefits, an employee must apply for the benefits by supplying an Affidavit that they meet Defendant's domestic partner qualifications. (Doc. 33, pg. 12, Ex. 2). Defendant requires employees to meet the qualification at the time they sign up. (Doc. 33, pg. 13). As it concerns the fourth requirement, Defendant does not have an official definition of what it means by "personal residence," but Mr. Jessup gave his "best guess" that "it would be residing in the same household." (Doc. 33, 13-14). Defendant does not appear to officially define what it means by "spouse-like relationship" either, though Mr. Jessup described the term as "fairly explanatory," though he also indicated "we would, certainly, you know, understand why [an employee] had that question and what would lead them to have that question and provide as much verification as we could." (Doc. 33, pg. 14-15). The final requirement dictates the employee and their domestic partner must be financially interdependent. (Doc. 33, Ex. 2). Defendant does not have an "official definition" of what it means by "financial interdependence," but it was Mr. Jessup's "interpretation" that the employee and domestic partner "live in a relationship…where they share finances." (Doc. 33, pg. 15-16). To satisfy the final requirement, an employee must provide documentation, which may be "documents showing shared primary residence; joint mortgage; lease, or deed record; joint banking account or credit card, designation of opposite-sex partner as a durable power of attorney, or other similar

documentation of financial interdependence." (Doc. 33, pg. 45, Ex. 2). If one of the required documents are not submitted, the application is denied. (Doc. 33, pg. 17).

Defendant does not perform a regular audit to see if employees are in compliance with this benefit program. (Doc. 33, pg. 18). Instead, if issues are brought to Defendant's attention, it will investigate. *Id.* Additionally, it will perform "ad hoc" audits "[depending] on the circumstances." *Id.* When questioned about the requirements that apply when a joint bank account is used to demonstrate financial interdependence, Mr. Jessup indicated there is no specific balance that the Defendant requires in the bank account, and no objective criteria it applies to determine financial interdependence. (Doc. 33, pg. 20-21). The decision of whether an employee is financially interdependent with a domestic partner is made subjectively by the Defendant. *Id.* The employee has sixty days to notify Defendant of any change in circumstances that would affect Domestic Partnership benefits. (Doc. 34, Ex. 9).

Following her EEOC Charge of Discrimination, the relationship between the Plaintiff and Mr. Freeman had developed such that they were living together, sharing expenses, and had opened a joint bank account. (Doc. 34, pg. 184-185). On November 24, 2014, the Plaintiff applied with the Defendant to add Brandon Freeman as a Domestic Partner to her flight benefits. (Doc. 34, pg. 83). The application was signed by both the Plaintiff and Mr. Freeman. They submitted a copy of their joint bank statement to confirm with the black letter requirements of Defendant's policy to demonstrate financial interdependence. (Doc. 34, pg. 85). The application was approved by the Defendant, and Mr. Freeman was added to the Plaintiff's Domestic Partner flight benefits. (Doc. 33, pg. 18).

### D.  Defendant subpoenas Plaintiff to testify in *Freeman, et al v. Delta Air Lines, Inc.*, 2:15-cv-00160.

Following Mr. Freeman's addition to the Plaintiff's Domestic Partner flight benefits, Mr. Freeman filed a lawsuit against Delta Air Lines, Inc. (App. B). The lawsuit was filed in this Court on or about September 3, 2015. *Id.* The lawsuit sought class certification for a group of African American employees, including Mr. Freeman, alleging racial based harassment, race discrimination, retaliation, and punitive damages. *Id.* Many of the allegations raised by the plaintiffs in that case, and particularly Mr. Freeman, concern issues raised by the Plaintiff in her first EEOC Charge of Discrimination filed in September 2014.

During the pendency of the *Freeman* case, the Defendant took the deposition of Brandon Freeman on September 29, 2016. (Doc. 34, pg. 90). During the deposition, Mr. Freeman was asked about his address, wherein he stated he has two permanent residences, one in Cincinnati and one at Plaintiff's address in Covington. (Doc. 34, pg. 87-88, Ex. 10). He testified the Cincinnati and Covington addresses were the only places he has lived since 2010. (Doc. 34, Ex. 10, pg. 11). He explained there is no set schedule that determines in which home he resides, and that he and the Plaintiff spend five nights a week together. *Id.*

He was also questioned about his daughter, who was born in 2015. His daughter was born to a woman who was not the Plaintiff during the time period Plaintiff and Mr. Freeman were living together. (Doc. 34, pg. 88-90, Ex. 10). He also informed that he had been seeing this person for approximately 1 ½ years. *Id.* When questioned about his relationship with the Plaintiff as of September 29, 2016, Mr. Freeman testified "[w]e're not currently in a romantic relationship right now. We're just in a partnership." (Doc. 34, pg. 92, Ex. 10). When asked to describe what Mr. Freeman meant by "partnership," Mr. Freeman informed that his daughter was living "in our home" in Covington, but they were "taking a break." *Id.* He then described that in his opinion the

relationship was "on again/off again." (Doc. 93, Ex. 10). Mr. Freeman further testified that the couple have a joint bank account, that they maintain two households but reside in both of them (they each keep personal belongings in the home deeded to the other), that they sleep in the same bed despite not always being romantically involved, and that they exchange money with each other regularly for "everyday things". (App. C, 193-197).

The Plaintiff was subpoenaed to testify in the *Freeman* case on October 11, 2016. (Doc. 34, pg. 186). This was to be the first of two days she was deposed in the *Freeman* case. Between the time Mr. Freeman's deposition concluded, and hers was commenced, no one with the Defendant approached her and indicated a problem with her Domestic Partnership Affidavit. *Id.* When her deposition commenced, initial questioning was handled by Defendant's lawyer Dave Croall. (Doc. 38, pg. 7). During her deposition testimony in the *Freeman* matter, the Plaintiff testified she did not want to provide testimony in the *Freeman* case because she was concerned for her job with the Defendant. (Doc. 38, pg. 14). The Plaintiff described her relationship with Mr. Freeman as being both sexually intimate and one of "best friends." (App. C, pg. 15-16). The Plaintiff indicated she and Mr. Freeman live together between their two permanent residences, and sleep together based in part on Mr. Freeman's work schedule. (Doc. 34, pg. 17).

Much of the remaining testimony relayed by the Plaintiff the first day of her deposition supported many of the allegations contained in the *Freeman* plaintiffs' Complaint. For instance, she testified that: she heard racial epithets used by Defendant employees (Doc. 38, pgs, 49-50); heard employees were disciplined differently because of their race (Doc. 38, pgs. 59-60); and black employees received the worst job assignments (Doc. 38, pgs. 70-74). Specific to Mr. Freeman, she testified concerning many of the allegations she raised in her September 2014 EEOC Charge of Discrimination. (Doc. 38, pg. 78-79, 90-93, 128, 148, 159, 186, 216). In fact,

the Plaintiff quite bluntly testified she did not believe management at Delta wanted Mr. Freeman

working at the airport anymore, and because he was a black man dating a white woman. (Doc.

38, pg. 168, 222). The Plaintiff in her deposition in this matter stated she believed her testimony

was helpful to the *Freeman* plaintiffs. (Doc. 34, pg. 188).

When she was not providing testimony helpful to the *Freeman* plaintiffs, she was

questioned extensively about her relationship with Mr. Freeman. In addition to the information

that was inquired of and described above, the attorneys for the Defendant (and Defendant's

employees who were individually named Defendants), continued to seek information concerning

the Plaintiff's relationship with Mr. Freeman and asked about the couples' joint banks account.

The Plaintiff informed that she and Mr. Freeman use the account as a savings account, to

accumulate money for Christmas. (Doc. 38, pg. 120).

The Plaintiff's deposition in the *Freeman* matter was continued on October 27, 2019.

(Doc. 38). Her testimony, once again, supported many of the allegations raised by the *Freeman*

plaintiffs in their Complaint, including: comments made by Delta employees concerning a white

woman dating a black man. (Doc. 38, pg. 255-256); unfavorable work assignments given to

black employees (Doc. 38, pg. 303); uneven disciplinary treatment of black employees (Doc. 38,

pg. 305); Defendant employees were critical of her spending time with Mr. Freeman (Doc. 38,

pg. 307-308, 311); the existence of a set of work rules called the "Brandon Freeman Rules"

(Doc. 38, pg. 321).

The second day of deposition also brought more questions concerning her relationship

with Mr. Freeman. Indeed, prior to the deposition, Defendant subpoenaed bank records relative

to her joint account with Mr. Freeman. (Doc. 38., pg. 290). She was questioned extensively by

Mr. Croall concerning the use and purpose of the account and when the account was opened.

(Doc. 38, pgs. 290-294).

### E. Following her deposition testimony in the *Freeman* case, the Plaintiff receives employee discipline from Defendant, and then tries to appeal the discipline.

On December 17, 2016, just shy of two months following her deposition in the *Freeman* matter, the Plaintiff was summoned into an office and met by her supervisor, Defendant employee Matt Arlinghaus. (Doc. 34, pg. 104). During this meeting Mr. Arlinghaus read an email from him to her that contained a Final Corrective Notice directed to the Plaintiff. (Doc. 34, pg. 105, Ex. 11). The Final Corrective Notice states in part:

> "During recent depositions in a legal matter involving Mr. Freeman, Mr. Freeman identified his residence different from yours. He also testified that his relationship with you is "on again/off again" and that the two of you had been "taking a break" during the last three months. As part of the same proceeding, you claimed under oath that you and Freeman had lived together "on and off" for a couple of years but admitted that you have always maintained separate residences for which you each pay your own expenses, both before and after the date of your Affidavit. Furthermore, your evidence of financial interdependence is a joint bank account that you share with Mr. Freeman. You described the account as a "Christmas Fund" and a review of the bank statements you produced demonstrate the account has never had a balance in excess of $100.00. These facts, as well as other testimony from you and Mr. Freeman regarding other romantic relationships and the birth of his child raise serious questions about the veracity of your certification that the two of you have lived in a spouse-like relationship."

(Doc. 34, Ex. 11).

The Final Corrective Notice informed the Plaintiff that she did not meet the "requirements" for a Domestic Partnership. *Id.* As a result, the Defendant removed Mr. Freeman from the Plaintiff's travel benefits, suspended the Plaintiff's travel benefits for a two year period (ending on December 15, 2018), and for 36 months any request for transfer, promotion or special assignment was subject to review and she was ineligible for transfer, promotion or special assignment outside of her department. *Id.* During this meeting, the Plaintiff testified that Mr.

Arlinghaus apologized to her and did not understand why she was being disciplined. (Doc. 34, pg. 106-107).

Following this meeting, the Plaintiff contacted Defendant employee Matt Morrison in January 2017. (Doc. 34, pg. 107-108, Ex. 12). The Plaintiff wanted to know whom she could contact to contest the employee discipline she received. *Id.* Mr. Morrison initially informed the Plaintiff he agreed with the Final Corrective Notice because despite additional information that she and Mr. Freeman pay for "insurance payments...[those] alone do not meet Delta's financial interdependence requirement for a qualifying spouse-like domestic partnership," but that he would welcome additional information. (Doc. 34, Ex. 12). The Plaintiff provided Mr. Morrison with the additional information in a January 6, 2017 email, in which she was allowed to provide an in-depth account of her relationship with Mr. Freeman. *Id.* Mr. Morrison then informed the Plaintiff she could appeal her suspension to Defendant's Equal Employment office headed by Brian San Souci. (Doc. 34, pg. 108, Ex. 12). On February 27, 2017, the Plaintiff filed a second Charge of Discrimination with the EEOC that is the subject of this litigation. (Doc. 34, pg. 124-125, Ex. 13).

The Plaintiff recalls initially speaking directly to Mr. San Souci. (Doc. 34, pg. 109). There is a stream of emails between the Plaintiff and Mr. San Souci beginning on June 27, 2017 and ending on July 20, 2017. (Doc. 34, Ex. 17). She recalls being told by Mr. San Souci that she lost her benefits because Mr. Freeman had a child with another woman during the time period she claimed that she and Mr. Freeman were domestic partners. *Id.* She explained that despite this fact, they were still in a relationship. *Id.* Mr. San Souci agreed to look into the matter further, and indicated it was because she and Mr. Freeman own two pieces of property. (Doc. 34, pg. 110).

The Plaintiff then relayed she provided a list of employees believed to be receiving domestic partnership benefits while owning two pieces of property. *Id.*

Ultimately, Mr. San Souci explained to the Plaintiff that simply having Mr. Freeman on her flight benefits was enough to discipline the Plaintiff. (Doc. 34, pg. 110, Ex. 17). He added that based on the information in her joint bank account with Mr. Freeman, the fact she and Mr. Freeman owned two pieces of property, and "other factors," the qualifications for the Domestic Partnership flight benefit program were not met and he was closing his case in the matter. *Id.*

## III.     STANDARD OF REVIEW

Summary judgment is proper if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). As the Supreme Court has explained, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986).

In deciding a motion brought under Rule 56, the Court must view the evidence in a light most favorable to the nonmoving party. *Pack v. Damon Corp.,* 434 F.3d 810, 813 (6th Cir. 2006). In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

## IV.     ARGUMENT

### A.  **Plaintiff's Racial Discrimination claims in Count I and II of the Complaint survive summary judgment.**

Prior to addressing Defendant's concerns, the Plaintiff is withdrawing her claim under

Counts I and II for racial harassment. Obviously, the allegations stemming from the September 24, 2014 EEOC charge cannot form the basis for a harassment claim in this case because the Plaintiff decided not pursue the matter after receiving her Right to Sue letter, and 90 days passed after the date she received the letter without a complaint being filed on those allegations. Additionally, after discovery on the issues, Plaintiff agrees the training she believes she missed, a schedule change, and discussion about her meeting minimum work hours will not support a harassment claim. She therefore withdraws that claim.

Defendant's additional argument in its motion that Count I and II of the Complaint do not survive summary judgment appears to be that the Plaintiff cannot prove an adverse employment action occurred in this matter. (Doc. 31, pg. 4). Defendant's argument misses the mark. The Plaintiff did suffer an adverse employment.

### 1. Plaintiff's Disparate Treatment Claims.

Defendant has correctly summarized the law regarding her claims for disparate treatment discrimination. Defendant has graciously accepted that Plaintiff can demonstrate she is a member of a protected class and that she was at all times qualified for her job. (Doc. 31, pg. 4). Plaintiff will address the Defendant's contention that she did not suffer an adverse employment action and address her requirements to establish a *prima facie* case. *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391 (6th Cir. 2008).

### a. Plaintiff suffered an adverse employment action.

Prior to explaining what adverse employment action the Plaintiff did suffer, it may be helpful to first indicate what the Plaintiff does not consider to be adverse employment actions. The Plaintiff agrees with Defendant that her initial suspicion that she was purposely not informed about training, her work schedule change, and her concerns about meeting minimum work

requirements are not adverse employment actions for purposes of a race discrimination claim.

What is abundantly clear is she did suffer a clear adverse employment action when she received her Final Corrective Notice which stripped her of her flight benefits for two years and forbid her from applying for a promotion outside her department for three years. In order to demonstrate an adverse employment action for purposes of the second prong of the *prima facie* test applicable to discrimination claims, a Title VII Plaintiff is required to demonstrate "a materially adverse change in the terms of [her] employment." *Chattman v. Toho Tenax America, Inc.*, 686 F.3d 339, 348 (6th Cir. 2012), (citing *Kocsis v. Multi-Care Mgmt.,* 97 F.3d 876, 885 (6th Cir. 1996)). A Final Corrective Notice that strips an employee of one of the two primary reasons she has for maintaining employment (Plaintiff's flight benefits), and makes the employee ineligible for promotion, adversely changes that employee's employment. *Id.* This adverse employment action is also the adverse employment action the Plaintiff asserts supports her retaliation claim (explained below), and which the Defendant concedes is not as limiting a definition in the retaliation context as it is in a discrimination claim. (Doc. 31, pg. 11). A Plaintiff can assert both a discrimination claim and a retaliation under the same operative facts, including proving the same adverse employment action.

**b. Plaintiff's remaining *prima facie* claim.**

Having established that she was a member of a protected class, eligible for her job, and that she suffered an adverse employment action, the facts must provide the Plaintiff was treated differently than similarly situated employees that are not members of the protected class. *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391 (6th Cir. 2008). There was no evidence in this case that anyone other than the Plaintiff, who was similarly situated to the Plaintiff and worked at CVG, was ever disciplined for the same reasons the Plaintiff was disciplined. The facts in this

14

case indicate she was the only one who received such discipline. The Plaintiff's testimony in this matter, and her emails to Defendant's employees appealing her adverse employment action, demonstrate that she had personal knowledge that other employees who own property together have not been subject to discipline for violating Defendant's domestic partner flight benefits plan. (Doc. 34, pgs. 143, Ex. 15). Owning two pieces of property was one of the reasons provided to her for her discipline. (Doc. 34, Ex. 12).

Plaintiff concedes Defendant has, for the purposes of the *McDonnell Douglas/Burdine* burden shifting analysis, met its burden of production concerning its reason for disciplining the Plaintiff. *McDonnell Douglas Corp. v, Green*, 411 U.S. 792 (1973); *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248 (1981). The Plaintiff addresses why Defendant's reasons were pretextual, and ultimately discriminatory, below. ¶ IV.B.1. As a result, Defendant's motion for summary judgment on Plaintiff discrimination claim should be denied.

**B.  Plaintiff's Retaliation Claim survives summary judgment.**

The Defendant has provided the Court with the law applicable to analyzing Plaintiff's retaliation claim in this case, except for an analysis of the issue of pretext discussed below. The Defendant only raises two issues concerning Plaintiff's retaliation claim: 1) that it had a legitimate, non-retaliatory reason for taking adverse employment action against the Plaintiff, and 2) that she cannot establish the causation element of her claim. (Doc. 31, pg. 12, 14).

**1.  There are sufficient facts in the record for the Plaintiff to demonstrate by a preponderance of the evidence that the Defendant's reasons for discipling her were pretextual.**

The first issue raised by the Defendant is really whether there are sufficient facts for a reasonable jury to determine by a preponderance of the evidence that the reasons given by the Defendant for issuing the Final Corrective Notice were pretextual. *Lee v. Cleveland Clinic*

*Foundation*, 676 Fed.Appx. 488, 499 (2017). The decision in *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078 (6ᵗʰ Cir. 1994) (*overruled* on other grounds) supplies the framework for analyzing the Plaintiff's burden for providing sufficient facts to allow a jury to reject an employer's proffered "legitimate" reason for discipline as pretextual. The sufficient proof of pretext "may be 'shown either directly by persuading the [trier of fact] that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'" *Id.* at 1082, (citing *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248 (1981)).

In the Sixth Circuit, to demonstrate pretext the Plaintiff must show by a preponderance of the evidence that: 1) the proffered reasons for the adverse employment action taken by the employer have no basis in fact; 2) the proffered reasons did not actually motivate the adverse employment action; or 3) the reasons provided were insufficient to motivate the adverse employment action. *Manzer,* 29 F.3d at 1084. The first and third showing of pretext are "direct attacks on the credibility of the employer's proffered motivation for firing plaintiff, and if shown, provide an evidentiary basis for…a suspicion of mendacity." *Id.* The first type of showing concerns when the conduct the employee is accused of engaging in did not actually happen. *Id.* The third type of showing usually "consists of evidence that other employees, particularly employees not in the protected class" were not similarly disciplined for similar conduct. *Id.* In the second type of showing, a plaintiff "admits the factual basis underlying the employer's proffered explanation and further admits that such conduct could motivate [the adverse employment action]." *Id.* A plaintiff in this situation attacks the employer's reasons for the adverse employment action by showing "circumstances which tend to prove that an illegal motivation was *more* likely than that offered by the defendant. In other words, the plaintiff

16

argues that the sheer weight of the circumstantial evidence of discrimination makes it 'more likely than not' that the employer's explanation is a pretext or coverup." *Id.* In this case, there are sufficient facts to demonstrate pretext under the second *Manzer* showing.

The Plaintiff can demonstrate pretext under the second *Manzer* test the reasons provided by the Defendant for the Final Corrective Notice did not actually motivate the adverse employment action. The problems the Defendant faces in the analysis of this issue are: the facts developed concerning how Defendant administers and oversees the Domestic Partnership flight benefits plan; the context in which Defendant went about gathering and then cherry picking information from the Plaintiff and Mr. Freeman in order to justify the discipline it gave her; how it ignored more information the Plaintiff provided during her appeal of the decision; and how it modified and/or added to its justification to discipline the Plaintiff.

As described above in the counterstatement facts, Defendant's Domestic Partnership flight benefits plan requires applicants to meet five requirements. There are only two requirements at issue in this case. Those requirements are that (1) an employee and the person to be added to the plan must be residing together in the same permanent residence and have lived in a "spouse-like" relationship for at least six continuous months, and (2) they are financially interdependent.

According to the Defendant, and concerning the first of the requirements at issue, there is no definition it provides to employees to explain what it means by "permanent residence." (Doc. 33, pg. 13-14). Defendant's "best guess" is that it means "residing in the same household." *Id.* Defendant does not clearly define what it means by "spouse-like relationship." It appears to require its employees to interpret that term on their own but would "understand why [an employee]" could have a question about what it meant, and if asked it would provide

verification. (Doc. 33, pg. 14-15).

The final requirement at issue, financial interdependence, is also not clearly defined by the Defendant. When applying, an employee simply needs to provide one of the documents listed in the Affidavit, one of which is a joint bank account statement. The Plaintiff and Mr. Freeman provided the required joint bank statement with their Affidavit. (Doc. 34, pg. 85). There is no specific balance that is required to be in the joint bank account to demonstrate financial interdependence, and the Defendant has no objective criteria it uses to determine financial interdependence. (Doc. 33, pg. 20-21). The Plaintiff testified that no one with the Defendant explained to her any specific definition of spouse-like relationship or what it meant by the term financially interdependent. (Doc. 34, pg. 184).

It cannot be disputed that the Defendant acquired the overwhelming majority of information it used to discipline the Plaintiff from testimony that was elicited during her two-day deposition in the *Freeman* matter. The Plaintiff was called as a witness by Defendant, and during her two-day deposition provided an extensive amount of information (described in the counterstatement of facts) which supported the *Freeman* plaintiffs' claims against Defendant. The Defendant also elicited information concerning her relationship with Mr. Freeman. Defendant also clearly relied on some information provided by Mr. Freeman in his deposition in disciplining the Plaintiff, but whatever information was gleaned from Mr. Freeman's deposition alone did not result in any discipline prior to Plaintiff's deposition. (Doc. 34, pg. 186). The information elicited that was used to discipline the Plaintiff was confined to where the couple lived, how often they spent the night together, how often they were romantic with each other, her reaction to Mr. Freeman fathering a child outside the relationship, and information concerning their joint bank account. Mr. Freeman and/or the Plaintiff testified they lived together, spending

18

time in two residences, and slept in the same house at least five nights per week to two weeks. (Doc. 34, Ex. 10), (Doc. 38, pg. 16-17).[1] The Plaintiff testified she believed the couple to be "in a relationship." (Doc. 38. pg. 15). They were not always romantically involved, sometimes for as long as three months. (Doc. 34, Ex. 10). The Plaintiff testified the couple had not engaged in sex in approximately two months. (Doc. 38, pg. 15). The joint bank account was used by the couple to save money for Christmas. (Doc. 38., pg. 120).

Mr. Freeman further verified in his deposition that the couple have a joint bank account, they maintain two households but reside in both of them (they each keep personal belongings in the home deeded to the other), that they sleep in the same bed despite not being romantically involved, and they exchange money with each other regularly for "everyday things". (App. C, 193-197).

On the second day of her deposition, Defendant subpoenaed the Plaintiff to provide her and Mr. Freeman's joint bank account records. Oddly, they did not do this to Mr. Freeman when he was deposed a month earlier. The Plaintiff and her attorney were reluctant to provide this information, because it was clearly irrelevant to the matters in the *Freeman* litigation. Nevertheless, she provided the bank records. Less than two months following the deposition, and specifically for information collected during her deposition, she was disciplined by the Defendant.

The reasons provided by the Defendant for the adverse employment action varied each time the Plaintiff questioned why she was being disciplined. All of the reasons provided by the Defendant were supported by cherry picked portions of the depositions, while other testimony which indicated the Plaintiff and Mr. Freeman were in a relationship which met the requirements

---

[1] Additionally, Plaintiff testified in her deposition in this matter that had never lived apart for more than 60 days. (Doc. 34, pgs. 94, 185).

of a domestic partnership were ignored. The Final Corrective Notice informed her that because

of testimony provided by her and Mr. Freeman in the *Freeman* case that they were "on again/off

again," "taking a break during the last three months," "always maintained separate residences for

which you each pay your own expenses," characterized the Plaintiff and Mr. Freeman's joint

bank account as failing to show "financial interdependence, " and referenced Mr. Freeman's

infidelity, "serious questions" were raised about "the veracity of your certification that the two of

you have lived in a spouse-like relationship." (Doc. 34, Ex. 11).

    After receiving the Final Corrective Notice, the Plaintiff asked Defendant employee Matt

Morrison to whom could she appeal the discipline. Mr. Morrison informed her that she was

disciplined because he claimed she and Mr. Freeman did not reside in the same permanent

residence, were not in a "spouse-like relationship," and were not "financially interdependent."

(Doc. 34, Ex. 12). The additional information the Plaintiff provided Mr. Morrison concerning a

particular shared expense (insurance premiums related to two motorcycles) did not sway his

opinion. *Id.* The Plaintiff's follow up response with additional information concerning her

relationship with Mr. Freeman, including that they live together and she is raising his child with

him, went ignored by Mr. Morrison, and he instead referred her to Brian San Souci. *Id.*

    Emails between the Plaintiff and Mr. San Souci detail her attempts to further explain her

relationship with Mr. Freeman, as well as provide information concerning other employees

whom she believed owned two homes and were receiving domestic partner benefits. (Doc. 34,

Ex. 17). Mr. San Souci responded and informed Plaintiff that her discipline was justified by the

Defendant's policy that Mr. Freeman should never have been allowed to be added as a Domestic

Partner. (Doc. 43, Ex. 17). He added that because the joint bank account did not contain more

than $100.00, because she and Mr. Freeman each owned a piece of property, and "other factors"

on which he did not elaborate, he would not reverse the adverse employment action. *Id.* Mr. San Souci's primary claim that discipline was justified by the Defendant's policy because Mr. Freeman should never have been allowed to be added as a Domestic Partner is puzzling. As an initial matter, the Plaintiff's undisputed testimony indicates this "policy" did not go into effect until six months after she was disciplined. (Doc. 34, pg 35). Even if she is incorrect about that fact, it is also undisputed that Defendant approved her application to add Mr. Freeman as a domestic partner. (Doc. 33, pg. 18). Had Mr. Freeman been ineligible to be added certainly the information he and the Plaintiff allowed Defendant access to by signing the Affidavit to obtain domestic partnership benefits would have alerted Defendant to his ineligibility, and the application would have been denied. (Doc. 34, Ex. 9).

In sum, the facts in this case are sufficient to prove by a preponderance of the evidence the Defendant's proffered reasons for taking the adverse employment action against the Plaintiff were pretextual. Analyzing the second showing of pretext under *Manzer* in this case*,* the "sheer weight of the circumstantial evidence of discrimination makes it 'more likely than not' that the employer's explanation is a pretext or coverup." *Manzer,* 29 F.3d at 1082. A reasonable jury could easily determine that Defendant attempted to elicit testimony, largely irrelevant to the *Freeman* case, specifically designed and cherry picked to set up the Plaintiff to be in violation of a policy, the meaning of the requirements which are not clear to the Defendant itself (i.e. poorly defined, if defined at all) and subjective in nature. A reasonable jury could further determine the Defendant engaged in this conduct to punish the Plaintiff for testifying favorably for the *Freeman* plaintiffs. As a result, Defendant's motion on this issue should be denied.

### 2. The Plaintiff has provided sufficient facts to demonstrate a causal connection between her protected activity and the adverse employment action.

For purposes of Defendant's motion, the Plaintiff asserts the protected activity she

engaged in was her participation in the *Freeman* case, and her testimony which supported the allegations raised in that Complaint. Defendant does not argue in its motion that her participation in that litigation is not protected activity, nor could it. When an employee participates "in any manner in Title VII proceedings," that employee has engaged in protected activity for purposes of 42 U.S.C. 2000e-3. *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 582 (6th Cir. 2000).

The burden of proving protected activity is causally related for purposes of demonstrating a *prima facie* case is "minimal." *Upshaw v. Ford Motor Co.*, 576 F.3d 576, 588 (6th Cir. 2009). All the plaintiff must do is put forth some credible evidence that enables the court to deduce that there is a causal connection between the protected activity and the retaliatory action. *Id.* Temporal proximity is one indicator of a causal connection, and can be the sole indicator when the time between when the employee engages in protected activity and the retaliatory conduct is "very close." *Upshaw,* 576 F.3d at 588-589, *Lindsay v. Yates*, 578 F.3d 407, 419 (6th Cir. 2009). When temporal proximity is not as close in time, the Plaintiff needs to demonstrate some additional evidence of retaliatory conduct.

In this matter, the Plaintiff was disciplined less than two months following her deposition in the *Freeman* matter. The reason provided for her discipline was based on information Defendant's lawyers selectively elicited during that deposition, in which she provided testimony that clearly supported the *Freeman* plaintiffs' claims against the Defendant in that matter. Surely, based on these facts the Plaintiff can establish a causal link between her participation in the *Freeman* matter and the Final Corrective Notice she was given. As a result, Defendants 'motion on this issue should be denied.

**CONCLUSION**

For the foregoing reasons, Plaintiff Michelle Race requests the Court deny Defendant's

Motion for Summary Judgment.

RESPECTFULLY SUBMITTED,

ROUSH & STILZ, P.S.C

/s/ W. Kash Stilz, Jr.
W. KASH STILZ, JR.
19 West Eleventh Street
Covington, Kentucky 41011-3003
Telephone: (859) 291-8400
kash@roushandstilzlaw.com
*ATTORNEYS FOR PLAINTIFF*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 27th day of February, 2020, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ W. Kash Stilz, Jr.
W. KASH STILZ, JR.