IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION AT COVINGTON

CIVIL ACTION NO.: 2:18-CV-094-(WOB-CJS)

MICHELLE RACE                                              PLAINTIFF

VS.                    **MEMORANDUM OPINION AND ORDER**

DELTA AIRLINES, INC.                                       DEFENDANT

This employment discrimination case is before the Court on defendant's motion for summary judgment (Doc. 31).

The Court heard oral argument on this motion on Friday, January 14, 2022. Kash Stilz represented the plaintiff, and Richard Moore represented the defendant. Also present was Alesha Hamilton, an attorney from Mr. Moore's firm who was present to observe the hearing. Court reporter Lisa Wiesman recorded the proceedings.

Having heard the parties, the Court now issues the following Memorandum Opinion and Order.

### *FACTUAL AND PROCEDURAL BACKGROUND*

**A.   Race's Delta Employment**

Michelle Race, who is Caucasian, was hired by Delta in 2010 when her former employer, Comair, ceased operating. (Race Depo. I, Doc. 76, at 34, 46).[1] She was employed at Delta at the

---

[1] Race was deposed on three occasions: October 11, 2016 (Doc. 38), October 27, 2016 (Doc. 38), and August 15, 2019 (Doc. 34). The first two sittings are referred to collectively as "Depo. I" and the third sitting is referred to as "Depo. II."

Cincinnati/Northern Kentucky International Airport ("CVG") in Dept. 120 as a Ready-Reserve employee.[2] As such, Race worked part-time and received unlimited employee flight privileges, including "companion" passes which are issued only to domestic partners. These travel privileges are considered the biggest benefit of the Ready Reserve position. (Race Depo. I at 34-35).

Since 2011, Race has been in a romantic relationship with a former co-worker, Brandon Freeman, who is African-American. (Race Depo. I, Doc. 38 at 10, 86-88).

By way of background, in the fall of 2013, Delta management received anonymous complaints from other employees that Freeman was verbally and physically abusing Race at work. Delta began an investigation into the allegations.

Race testified that on September 25, 2013, she was called into a meeting with Chuck Jones, Department Manager, and Greg Kuhn, the Regional Corporate Security Manager covering CVG. These managers told Race that they had received complaints that Freeman was mistreating her. (Depo. I at 50-51, 78). Kuhn asked Race if she was in a relationship with Freeman and whether it was sexual, and Race told him yes. (Depo. I at 50-51). Kuhn also asked her how her family felt about her dating a black man, and Race told him

---

[2] Plaintiff took leave from Delta in October 2018 due to a non-work-related injury. (Race Depo. III, Doc. 34, at 9). Her counsel informed the Court during the above hearing that plaintiff voluntarily retired from Delta in October 2021.

2

that her family liked Freeman. Race testified that she told them that Freeman had not threatened her, that she was not afraid of him, and that he did not bully her. (Depo. I at 79). Race subsequently gave conflicting statements about the allegations, but ultimately denied any mistreatment by Freeman, so Delta closed its investigation.

In April 2014, Delta terminated Freeman's employment due to his violation of Delta's pass travel policies.

Race filed a charge with the EEOC on September 26, 2014 alleging that she had witnessed Delta discriminate against African-American employees and that she too had experienced harassment and retaliation. (Doc. 34 at 100-04). Race did not, however, file suit after receiving a Notice of Right to Sue, and she thus concedes in her response to Delta's motion for summary judgment that she cannot pursue those claims for racial harassment. (Doc. 39 at 12-13).

In November 2014, Race submitted to Delta an "Affidavit of Opposite Sex Domestic Partnership," listing Brandon Freeman as her domestic partner for the purpose of obtaining pass travel privileges for him. (Doc. 34 at 106-7). This affidavit swore, *inter alia*, that Race and Freeman were not married or in a domestic partnership with any other person; that they "reside[d] together in the same permanent residence and have lived in a 'spouse-like' relationship for at least six continuous months; and that they

3

were financially interdependent. (*Id.*). The affidavit stated that the employee was required to inform Delta if the domestic partnership terminated or changed such it no longer met the requirements of the affidavit. (*Id.*).

**B.  The Freeman Litigation and Subsequent Events**

Brandon Freeman and five other Delta employees filed a lawsuit in this Court on September 3, 2015. *Freeman v. Delta Air Lines, Inc.*, Case No. 15cv160. They alleged that Delta discriminated against them on the basis of race in discipline and work assignments.

Freeman was deposed on September 29, 2016. (Doc. 45) He testified that he and Race were not currently in a romantic relationship, but they had previously been in an "on-again/off-again" relationship; that they each owned their own home and did not make mortgage or utility payments on the other's house; that they stayed at the other's home frequently and kept personal belongings there; that he had a one-year old daughter by another woman during his relationship with Race, and that he had been in a relationship with that woman for about a year and a half; that Race was helping him raise that child; that they had not given each other money in the last three months; and that they had a joint bank account with about $50 in it. *Id.* at 8-13, 192-197.

Delta also took Race's deposition during the *Freeman* litigation. (Doc. 38). During her deposition in October 2016, Race

4

testified that:

- She and Freeman had been in an "off and on" relationship for a couple of years, and it was sometimes "off" for months. They often did not speak at all when the relationship was "off." (*Id.* at 10, 87, 204-05);

- Freeman was her "best friend," that they had sex, but they had not done so for two months. (*Id.* at 16-17);

- She did not know that Freeman had been having a relationship with the mother of his one-year-old child and it did not bother her. (*Id.* at 37, 203);

- She and Freeman owned separate houses, and they did not pay any expenses associated with the other's home. (*Id.* at 117-18);

- She and Freeman had a joint bank account to save money for Christmas, but their paychecks were deposited into separate, non-joint accounts, and Freeman had not made any deposit into the joint account within the last six months (*Id.* at 118-21, 195, 292-93). At the time of Race's deposition, there was approximately $18 in the joint account; and

- She and Freeman owned no other joint assets. (*Id.* at 293-94.).

Delta states that after these depositions, it determined that the requirements for Freeman to hold privileges as Race's domestic partner were not met, and so it placed Race on a final corrective action notice effective December 17, 2016. (Doc. 34 at 111-29). This notice stated, in part:

> During recent depositions in a legal matter involving Mr. Freeman, Mr. Freeman identified his residence as an address different from yours. He also testified that his relationship with you is "on again and off again" and that the two of you had been "taking a break during the last three months. As part of this same proceeding, you

5

>claimed under oath that you and Freeman had lived together "on and off" for a couple of years but admitted that you have always maintained separate residences for which you each pay your own expenses, both before and after the date of your Affidavit. Furthermore, your only evidence of financial interdependence is a joint checking account that you share with Mr. Freeman. You described that account as a "Christmas Fund" and a review of the bank statements you produced demonstrate the account has never had a balance in excess of $100. These facts, as we as other testimony from you and Mr. Freeman regarding other romantic relationships and the birth of his child raise serious questions about the veracity of your certification that the two of you have lived in a spouse-like relationship.
>
>Michelle, a review of these facts including the documentation you have provided has caused us to conclude that you and Mr. Freeman do not meet the requirements of a Domestic Partnership.

(Doc. 34 at 112).

This notice was communicated to Race by her supervisor, Matt Arlinghaus. He told Race that he had simply received an email containing the discipline notice and was told to read it to her, but that he otherwise knew nothing about the situation and apologized to her for it, asking her not to be mad at him. (Doc. 34 at 105-06). Race also testified that no one at Delta had questioned her about the matter before this time. (Doc. 34 at 106).

Freeman was thereafter removed from Race's pass travel benefits, her own flight privileges were suspended for two years, and she was made ineligible for two years for transfer, promotion, or special assignment outside of the department. (*Id.*).

6

Race promptly contacted Matthew Morrison in Delta's Human Resources department, explaining in detail the nature of her and Freeman's relationship in an email dated January 6, 2017. It bears quoting at length:

> Matt yes I would like to meet with you. I still don't understand how things that was [sic] answered in our depositions have been twisted and turned into this. I don't understand how I can be punished because of the fact that we own 2 houses. Brandon has went [sic] through a bankruptcy and financial restructure and isn't allowed to sell or rent his property for years. And he has money that comes out of his account automatically for other payments to places that was agreed upon in his [bankruptcy]. So we have no choice but to keep Brandon's property until the terms of his bankruptcy is over. At that time we plan on selling it. The motorcycles are 2 major purchases that we have made together and sharing the monthly responsibility of the payments and insurance that we have required because it is a[n] enjoyment that we share together. I don't understand how we don't have a spouse like relationship. We live together, and we have a child that we are raising together. My home is the only home that she knows. Everything that she owns is at my home. I might not have gave [*sic*] birth to her, but I couldn't love her any more if I would have. Brandon has full custody of her and she has never seen her Mother and never will. I take care of her when Brandon is working and my Mother watches her when we both work. My parents treat her just like one of their Grandchildren. Me and Brandon live together, shop together, have all meals together, sleep in the same bed together. We make sure to pay all of our bills, no we don't usually have a lot of money in our account together. Money goes in each and every month but it goes out also. By the time that all my bills are paid and all his bills are paid and we have bought everything the baby needs each week we never have any money left over. I love Brandon and would never want to be with anyone else. Brandon feels the same about me. Yes he cheated one time. We have been working on trusting again. But we are working on it together. You make it sound like because Brandon said our intimate/sexual relationship was on again/off again, because of the fact that it is hard working through the fact that not only did Brandon cheat one time, but that one time

7

> he did, he had a baby by that person. So I believe this would be hard for anyone to work through. . . . But we have managed to stay together 6 years, and we plan on staying together the rest of our life. I wouldn't want to be with anyone else. . . . We are a couple in a committed relationship with each other and a child together. I have asked pretty many people so far at work that are just living with someone how much money they have together in their bank account and most of them have said their accounts are separate that they don't even have an account together. So I'm not really sure on the amount of money that is expected from an average couple to keep, I never saw a dollar amount in the policy. I wasn't aware we had to keep a certain amount. We do share monthly bills together and monthly expenses. We share all the grocery bills together, any store items we use each day for laundry, personal care, eating out, all that expense is shared together, and we are raising a healthy and happy baby together, and we are only committed to each other, how can we be discriminated against, and me be punished for it. Please let me know when you will be available to meet.

(Doc. 34 at 114-18).

It does not appear that Morrison substantively responded to this email and, when he was unable to meet with Race, he told her that she could appeal the discipline to Brian San Souci, Delta's Manager of Equal Opportunity and Pass Protection. (Doc. 34 at 114).

In the meantime, Race filed another Charge of Discrimination with the EEOC on February 27, 2017 alleging, in part, that the Final Corrective Action constituted unlawful retaliation for her deposition testimony in the *Freeman* matter. (Doc. 34 at 119-21).

In the summer of 2017, Race contacted San Souci to ask for a copy of the Final Corrective Notice which she had been given. (Doc. 34 at 129). San Souci sent Race a copy of that document by email on June 29, 2017. (*Id.* at 128).

By email to San Souci on July 17, 2017, Race explained that this was the first time that she had had the chance to closely review her writeup, and she explained at length why she and Freeman at all times qualified for the domestic partner privileges. She also emphasized that she had never been given the opportunity to address Delta's concerns about the status of their relationship. (Doc. 34 at 127-28). Race stated that she felt that Delta's actions were retaliation for her having testified in the *Freeman* matter, and she asked him to let her know what was being done to investigate the situation. (*Id.*).

Three days later, San Souci sent Race an email informing her that the discipline was being upheld. (Doc. 34 at 126). San Souci first noted that Freeman should never have qualified for any pass privileges since he had been terminated from Delta for a pass violation. (*Id.* at 126). Souci reiterated, however, that the discipline was being upheld based on the facts to which Race and Freeman testified in their depositions. (*Id.*). San Souci made no mention of the information that Race had provided regarding the details of her relationship with Freeman.

Race's flight privileges were restored in December 2018. (Race Depo. II at 15). However, Race went on leave from Delta in October 2108 due to a non-work-related injury. (Doc. 34 at 174).

    C.    **This Lawsuit**

Race filed this lawsuit on June 6, 2018, alleging claims for

9

race discrimination under Title VII and Section 1981, racial harassment under Title VII (this claim has been withdrawn), and retaliation under Title VII and KRS 344.280. (Doc. 1).

## *Analysis*

### A. <u>Race Discrimination</u>

To establish a prima facie case of race discrimination, Race must show that: (1) she is a member of a protected group, (2) she was subjected to an adverse employment action, (3) she was qualified for her position, and (4) similarly situated non-protected employees were treated more favorably. *Smith v. City of Toledo*, 13 F.4th 508, 515 (6th Cir. 2021) (citation omitted).

If Race establishes such a prima facie case, the burden shifts to defendant to articulate a legitimate, nondiscriminatory reason for its decision. *Id.* "The burden then shifts back to [plaintiff] to show that the reason the employer gave was not its true reason, but merely a pretext for discrimination." *Id.* (internal quotations and citation omitted).

Here, Delta concedes that Race can establish that she was qualified and that she was a member of a protected group, because she alleges that she was discriminated against based on her association with a person of another race, Brandon Freeman. (Doc. 31 at 4 n.1.). *See Barrett v. Whirlpool Corp.*, 556 F.3d 502, 511 (6th Cir. 2009) (noting that both Title VII and Section 1981 forbid

10

discrimination on the basis of association with or advocacy for a protected party).

Delta argues, however, that Race cannot show that she suffered an adverse employment action or that any similarly situated non-protected employee was treated more favorably.

### 1. Adverse Employment Action

Race has abandoned any claim premised on numerous incidents she originally alleged in her complaint, but she pursues her claim for discrimination based on the Final Corrective Notice that Delta issued to her in December 2016. (Doc. 39 at 13-14).

For purposes of the prima facie case, "adverse employment actions are typically marked by a 'significant change in employment status,' including 'hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *O'Donnell v. Univ. Hosp. Cleveland Med. Ctr.*, 833 F. App'x 605, 620 (6th Cir. 2020) (citation omitted).

The Final Corrective Notice that Delta issued to Race in December 2016 caused a sufficiently negative impact on the terms of her employment to constitute an adverse employment action. That discipline not only removed Freeman from her pass privileges, but it suspended all of her own pass travel privileges for two years. It is not disputed that the unlimited travel privilege afforded Ready Reserve employees such as Race was a large component of their

11

compensation and considered the main attraction of the job. (Race Depo. I at 34-35).

In addition, Race testified that prior to this discipline, she had applied for and been offered a position in the Sky Club, which would have given her more hours. However, that offer was rescinded after she received the Final Corrective Action. (Race Depo. II at 25-27, 46).

In addition, the discipline rendered Race ineligible for raises, promotions, or transfers outside of her department for the same two-year period. (Race Depo. II at 27; Doc. 34 at 112).

For these reasons, the Final Corrective Action caused a materially adverse change on Race's employment such that it constitutes an adverse employment action.

### 2. Similarly Situated Employees

Although Race suffered an adverse employment action, her disparate treatment claim fails at the prima facie stage because she has not shown that any similarly situated employee outside the protected class (i.e., not in a relationship or closely associated with a person in a protected class) was treated more favorably.

Race conceded at oral argument that she cannot satisfy this showing, and the Court thus need not discuss it further.

### B. Retaliation

In order to state a prima facie case of retaliation under Title VII, a plaintiff must demonstrate that (1) she engaged in a

12

protected activity, (2) the employer knew of the protected activity, (3) the employer took adverse employment action against the plaintiff, and (4) there was a causal connection between the protected activity and the adverse employment action. *Wyatt v. Nissan North Am., Inc.*, 999 F.3d 400, 419 (6th Cir. 2021) (citation omitted).

"In the retaliation context, the term 'adverse employment action' encompasses more than just actions that affect 'the terms, conditions or status of employment.'" *Id.* Rather, it "includes any conduct 'that would have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Id.*

The Sixth Circuit has also noted that "the plaintiff's burden at the prima facie stage is minimal and easily met." *Id.* (internal quotations and citation omitted).

As with discrimination claims, once a plaintiff establishes a prima facie case of retaliation, the defendant must produce a nonretaliatory reason for its action, and the plaintiff then must show that a reasonable person could find that reason to be a pretext for retaliation. *Id.* at 419-20.

"Plaintiffs ordinarily show pretext by showing that the proferred reason [] (1) had no basis in fact; (2) was insufficient motivation for the employment action; or (3) did not actually motivate the adverse employment action." *Briggs v. Univ. of*

13

*Cincinnati*, 11 F.4th 498, 515 (6th Cir. 2021) (internal quotations and citations omitted).

It is not disputed that plaintiff engaged in a protected activity of which Delta was aware: her deposition testimony in the *Freeman* matter. And, as discussed above, the Final Corrective Notice upon which Race bases her retaliation claim constitutes an adverse employment action, particularly under the relaxed standard applicable to retaliation claims.

Finally, Race has established the prima facie element of causation based on temporal proximity because she received the Final Corrective Action less than two months after she completed her deposition in October 2016. *See Wyatt*, 999 F.3d at 424-25 ("The close temporal proximity of Wyatt's protected activities to Nissan's adverse actions by themselves may suffice to establish a causal connection."). Race has thus established a prima facie case of retaliation.

Delta argues in its motion for summary judgment that Race cannot show that Delta's proffered reason for issuing the Final Corrective Action—its belief that Race had improperly claimed domestic partner travel benefits for Freeman—was a pretext for retaliation.

Plaintiff invokes the third means of showing pretext: that Delta's stated reason, while perhaps sufficient to take the challenged action, did not *actually* motivate its action. *Id.* at

14

425. In such a situation, the plaintiff can prove pretext by arguing "that the sheer weight of the circumstantial evidence" makes it "more likely than not" that the employer's explanation is pretextual. *Id.* (citing *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994), *overruled on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009)).

And, although temporal proximity alone cannot be the basis for finding pretext, "it can be a strong indicator of pretext when accompanied by some other, independent evidence." *Briggs*, 11 F.4th at 516 (internal quotations and citations omitted).

Viewing the evidence in the light most favorable to Race, a reasonable jury could find that Delta's stated reason for issuing the Final Corrective Action to Race in December 2016 was a pretext for retaliation against her for testifying in the *Freeman* matter. A variety of undisputed facts lead to this conclusion.

First, while Freeman's deposition testimony about his relationship with Race was cited by Delta as part of the reason for disciplining Race, there is no evidence that Delta began investigating the matter after Freeman's deposition. Rather, Delta apparently did not begin an "investigation" until after Race gave two days of deposition testimony in support of the *Freeman* plaintiffs, a month later.

Second, while Delta invokes the familiar "honest belief" defense to argue that even if it was incorrect about the nature of

15

Race and Freeman's relationship, its decision based on their deposition testimony cannot be shown to be retaliatory. Delta is incorrect.

First, the honest belief defense is meant to rebut a showing of pretext under the *first* prong, i.e., that the proferred reason had no basis in fact. *See Briggs*, 11 F.4th at 515. But Race is not proceeding under that prong of the pretext inquiry. Nor could she because there is no dispute that she and Freeman gave the deposition testimony in question.

Instead, Race is proceeding under the third prong of the pretext analysis: that Delta's proferred reason did not *actually* motivate its decision to discipline her. (Doc. 39 at 17). As such, the honest belief defense is inapplicable. *Id.; see also Wyatt*, 999 F.3d at 425 ("However, Nissan cannot enjoy the protection of the 'honest belief' rule if Wyatt demonstrates pretext by showing that even if Davis held concerns about her performance, those concerns did not actually motivate Davis to issue the negative performance evaluations.").

Even if the defense were applicable, Delta would not be entitled to summary judgment. The honest belief defense is not available where the employer failed to make a reasonably informed and considered decision before taking its adverse employment action. *Babb v. Maryville Anesthesiologists P.C.*, 942 F.3d 308, 323 (6th Cir. 2019).

16

Here, the record demonstrates that Delta used plaintiff's deposition to elicit information about her relationship with Freeman, which was not even relevant to the claims in the *Freeman* matter. Delta went so far as to insist on a second sitting so that it could subpoena Race's bank records and then question her about them during the deposition.

Then, less than two months after the deposition, Delta disciplined Race, stripping her of her valued flight privileges for two years and rendering her ineligible for raises, promotions, or transfers, without even giving her the opportunity to address their concerns. The supervisor who was instructed to give her the notice had no idea why it was being issued. A reasonable jury could conclude from this that, essentially, Delta used Race's deposition as an opportunity to lay a foundation to take an adverse action against her.

Additional evidence calls Delta's motivation into question. After receiving the Final Corrective Action, Race immediately reached out to Human Resources with an impassioned explanation of the full details of her relationship with Freeman in order to place their deposition testimony in context and to demonstrate that they were, in fact, in a spouse-like relationship. Neither Matthew Morrison nor Brian San Souci appears to have even acknowledged the information Race provided, even though she implored them to meet with her so that she could discuss it in person. In fact, San

17

Souci's final email affirming the discipline does not even acknowledge the information Race provided or explain whether or how Delta took it into consideration.

This is strong evidence from which a reasonable jury could infer that Delta's proffered justification did not actually motivate its decision to discipline Race. *See, e.g. Yazdian v. Conmed Endoscopic Tech., Inc.*, 793 F.3d 634, 653-54 (6th Cir. 2015) (rejecting honest belief defense and finding a triable issue of pretext where employer based its discipline solely on supervisor's statement and it did not interview plaintiff despite him telling management that he wanted an opportunity to present his side of the story). *Cf. Nathan v. Great Lakes Water Authority*, 992 F.3d 557, 572 (6th Cir. 2021) (affirming grant of summary judgment on retaliation claims; employer had honest belief that employee falsified a report and it attempted to get her side of the story, but she refused to make a statement).

In fact, although Delta repeatedly asserts that it conducted an "investigation" into the matter, the record contains no such evidence. Delta's Rule 30(b)(6) witness, Josh Jessup, had no personal knowledge of how Delta reached the decision to discipline Race or even who made the decision. (Jessup Depo., Doc. 33, at 22-23). Oddly, Delta never states in its briefing who the decisionmaker was.

And, while Delta cites Jessup's deposition for its assertion

18

that "Delta consistently takes disciplinary action against employees who provide inaccurate information in the application for domestic partner flight benefits," (Doc. 31 at 15), his testimony says nothing of the sort. Jessup merely stated that Delta does not do regular audits of those using domestic partner flight privileges, and that if something was brought to their attention, "we'll investigate that." (Doc. 33 at 18).

Finally, the fact that San Souci lastly asserted that Freeman should never have been granted domestic partner flight privileges in the first place suggests that Delta went beyond its original asserted justification—Race and Freeman's deposition testimony—in order to affirm its decision.

In sum, viewing the evidence in Race's favor, a reasonable jury could find that Delta's handling of this entire situation, particularly its refusal to consider Race's explanation and its lack of transparency regarding how the matter was "investigated" and who made the decision, suggests that its proferred reason did not actually motivate its decision to discipline Race. Instead, a jury could find that Delta disciplined Race as a direct means of retaliating against her for testifying in the *Freeman* case.

Delta's motion for summary judgment on Race's retaliation claim will thus be denied.

Therefore, having heard the parties, and the Court being advised,

**IT IS ORDERED** that:

(1) Defendant's motion for summary judgment (Doc. 31) be, and is hereby, **GRANTED IN PART** as to plaintiff's race discrimination claims and **DENIED IN PART** as to plaintiff's retaliation claim; and

(2) The parties shall file a status report **on or before February 14, 2022** advising the Court whether they were able to resolve this matter and, if not, when they anticipate being ready for trial.

This 21st day of January 2022.



Signed By:
*William O. Bertelsman*   WOB
United States District Judge